**REESE LLP**
Michael R. Reese (Cal. State Bar No. 206773)
Sue J. Nam (Cal. State Bar No. 206729)
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Email: *mreese@reesellp.com*
        *snam@reesellp.com*

**THE LAW OFFICE OF DAVID C. DEAL, P.L.C.**
David C. Deal (admitted *pro hac vice*)
P.O. Box 1042
Crozet, Virginia 22932
Telephone: (434) 233-2727
Email: *david@daviddeal.com*

**REESE LLP**
Charles D. Moore (admitted *pro hac vice*)
100 South 5th Street, Suite 1900
Minneapolis, Minnesota 55402
Telephone: (701) 390-7214
Email: *cmoore@reesellp.com*

**REESE LLP**
George V. Granade (Cal. State Bar No. 316050)
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Telephone: (310) 393-0070
Email: *ggranade@reesellp.com*

*Counsel for Plaintiff Harold Davis*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| HAROLD DAVIS,<br><br>                              Plaintiff,<br><br>         vs.<br><br>PINTEREST, INC.<br><br>                              Defendant. | Case No. 4:19-cv-7650-HSG (TSH)<br><br>**PLAINTIFF'S NOTICE OF MOTION; MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:      December 9, 2021<br>Time:      2:00 p.m.<br>Judge:     Hon. Haywood S. Gilliam, Jr.<br>Place:     Courtroom 2<br>               United States Courthouse<br>               1301 Clay Street<br>               Oakland, California 94612 |

1

## NOTICE OF MOTION AND MOTION

2

PLEASE TAKE NOTICE that on December 9, 2021, at 2:00 p.m., or as soon thereafter as

3

the matter may be heard, in Courtroom 2 of the United States Courthouse, 1301 Clay Street, Oakland,

4

California 94612, before the Honorable Haywood S. Gilliam, Jr., Plaintiff Harold Davis will and

5

hereby does move for partial summary judgment.

6

Plaintiff respectfully seeks partial summary judgment pursuant to Federal Rule of Civil

7

Procedure 56(a) on the following issues against Defendant Pinterest, Inc.: (1) Pinterest is liable for

8

copyright infringement and (2) Pinterest does not have any of the affirmative defenses it asserted,

9

including the defense of fair use and safe harbor under the Digital Millennium Copyright Act.

10

Plaintiff bases this motion on the following documents: this Notice of Motion and Motion,

11

the accompanying Memorandum of Points and Authorities, the accompanying Declaration of

12

Charles D. Moore, the pleadings, record, orders, and other filings in this case, and on such other

13

written and oral points, authorities, and evidence as the parties may present to the Court on or before

14

the time of the hearing on the motion.

15

Dated: November 4, 2021                              **REESE LLP**

16

*/s/ Sue J. Nam*

17

Sue J. Nam

18

Michael R. Reese
100 West 93rd Street, 16th Floor

19

New York, New York 10025
Telephone: (212) 643-0500

20

Email: *mreese@reesellp.com*
            *snam@reesellp.com*

21

**REESE LLP**

22

Charles D. Moore (admitted *pro hac vice*)
100 South 5th Street, Ste 1900

23

Minneapolis, Minnesota 55402
Telephone: (212) 643-0500

24

Email: *cmoore@reesellp.com*

25

**REESE LLP**
George V. Granade

26

8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211

27

Telephone: (310) 393-0070
Email: *ggranade@reesellp.com*

28

**THE LAW OFFICE OF DAVID C. DEAL, P.L.C.**
David C. Deal (admitted *pro hac vice*)
P.O. Box 1042
Crozet, Virginia 22932
Telephone: (434) 233-2727

*Counsel for Plaintiff Harold Davis*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**<u>TABLE OF CONTENTS</u>**

NOTICE OF MOTION AND MOTION ...................................................................................... 1

Table of Contents ............................................................................................................................. i

Table of Authorities ...................................................................................................................... iii

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ............................................................................................................................. 1

I.      HAROLD DAVIS AND HIS COPYRIGHTED WORKS ................................................ 1

II.     PINTEREST'S UNIFORM TREATMENT OF ALL PINNED IMAGES ......................... 2

     A.    Unauthorized Creation of Derivative Works ........................................................ 2

          1.    Pinterest Displays Only Contents that It Creates ..................................... 2

          2.    Pinterest-Created Content Is Embedded with Pinterest's Data
               to Drive Pinterest Advertising Revenue ................................................... 4

     B.    Unauthorized Public Display of Works with Advertisement ................................ 6

     C.    Unauthorized Display and Distribution of Works in Notifications ........................ 8

III.    PINTEREST'S INFRINGING USES OF DAVIS' WORKS ............................................ 9

IV.     PINTEREST'S FLAWED DMCA TAKEDOWN PROCEDURE ................................... 10

     A.    Pinterest's Takedown Procedure Does Not Address Its Own
          Infringement ......................................................................................................... 10

     B.    Pinterest's DMCA Take Down Procedure Is Not Meaningful to
          Professional Photographers Like Mr. Davis ....................................................... 13

     C.    Pinterest Did Not Offer Any Other Meaningful Remedies to Mr.
          Davis .................................................................................................................... 16

V.      PINTEREST'S HINDRANCE OF PLAINTIFF IN GATHERING
     EVIDENCE OF INFRINGEMENT AND WILLFUL BLINDNESS TO THE
     COPYRIGHTS OF PROFESSIONAL PHOTOGRAPHERS ......................................... 18

     A.    Pinterest Hindered Plaintiff's Ability to Gather Evidence of
          Infringement in This Case ................................................................................... 18

     B.    Pinterest Is Willfully Blind to the Copyrights of Professional
          Photographers ...................................................................................................... 23

LEGAL STANDARD .................................................................................................................... 25

ARGUMENT ................................................................................................................................. 26

I.      THERE ARE NO GENUINE ISSUES OF FACT WITH RESPECT TO
     LIABILITY ...................................................................................................................... 26

     A.    Mr. Davis Holds Valid Copyright Registrations ................................................ 26

     B.    Pinterest Violated Mr. Davis' Exclusive Rights Under the Copyright
          Act ....................................................................................................................... 26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

II.     THERE ARE NO GENUINE ISSUES OF FACT THAT PINTEREST
        LACKS  VIABLE DEFENSES.........................................................................................27

        A.      Pinterest's Uses of Mr. Davis' Works Do Not Constitute Fair Use........................28

        B.      Pinterest Is Not Entitled to the DMCA Safe Harbor ................................................30

        C.      Pinterest Cannot Prove Its Remaining Affirmative Defenses ..................................32

CONCLUSION ........................................................................................................................32

1

2

### **TABLE OF AUTHORITIES**

3

**Cases**

4

*A & M Records v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) .......................................... 26, 27, 30

5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).................................................................... 25

6

*Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569 (1994)............................................................ 27

7

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).............................................................................. 25

8

*Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020 (9th Cir. 2013).................................... 27, 31

9

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1159 (9th Cir. 2007) ............................ 26, 27

10

*Rano v. Sipa Press, Inc.*, 987 F.2d 580 (9th Cir. 1993)................................................................. 27

11

*VHT, Inc. v. Zillow Group, Inc.*, 918 F.3d 723 (9th Cir. 2019).................................................. passim

12

**Statutes**

13

17 U.S.C. § 106 ........................................................................................................................ 9, 26

14

17 U.S.C. § 107 .............................................................................................................................. 28

15

17 U.S.C. § 410 .............................................................................................................................. 26

16

17 U.S.C. § 512 ...................................................................................................................... 27, 30, 31

17

**Rules**

18

Fed. R. Civ. P. 30(b)(6) ........................................................................................................... passim

19

Fed. R. Civ. P. 33(d) ...................................................................................................................... 20

20

Fed. R. Civ. P. 56 ............................................................................................................................. 2

21

22

23

24

25

26

27

28

1

**INTRODUCTION**

2      Plaintiff Harold Davis is a digital artist and professional photographer, who earns his living

3   and supports his family through the sale and license of his photographic works. Although Defendant

4   Pinterest, Inc. touts itself as a social media platform, Pinterest, in reality, is an advertising company

5   that has built its business off the backs of copyright owners whom Pinterest does not pay. Pinterest

6   generates billions of dollars of annual advertising revenue but derives the content that drives this

7   revenue for free. It is in this context that the copyright dispute between Mr. Davis and Pinterest arose

8   with respect to the works at issue in this case (the "Works"), which are listed in Exhibit A to his

9   Second Amended Complaint, ECF No. 56-1, and consist of fifty-one of the thousands of

10  photographic works for which he has copyright registrations issued by the United States Copyright

11  Office. In his direct infringement claim, Mr. Davis has no quarrel with individual users of Pinterest

12  (*i.e.*, "Pinners"), who display Mr. Davis' Works on their Boards (*i.e.*, Pinterest's virtual bulletin

13  boards) for personal purposes because they admire or are inspired by the Works. What Mr. Davis

14  complains about is the unauthorized, commercial use of his Works by Pinterest by (1) making

15  derivative works from his Works without his permission to track user interaction with his Works and

16  to target advertising; (2) publicly displaying his Works to users in order to drive advertising revenue,

17  including for goods that directly compete with his own business; and (3) displaying and distributing

18  his Works by emails and push notifications to entice Pinterest users to interact with Pinterest's

19  website and app, again to generate advertising revenue. Now with the close of discovery, it is clear

20  that Pinterest is liable for copyright infringement and Pinterest does not have any viable affirmative

21  defenses such as fair use and safe harbor under the Digital Millennium Copyright Act ("DMCA").

22  The only issue remaining for trial is the amount of damages to which Mr. Davis is entitled.

23

**BACKGROUND**

24  **I.      HAROLD DAVIS AND HIS COPYRIGHTED WORKS**

25      Mr. Davis is "an artist that uses photographs as the medium for [his] art." Deposition

26  Transcript of Harold Davis ("Davis Tr."), Ex. 1 to Declaration of Charles D. Moore ("Moore Decl."),

27  66:17-18. Photography is his principal source of income. He supports himself and his family by

28  licensing photographs and selling prints, the income from which he supplements with writing books

and articles about photography and teaching photo workshops. *Id.* 9:12-14; 62:19-23; 66:20-21.

Mr. Davis is the sole owner of the copyrights to the Works. Davis Tr. 12:22-24. He registered each of the Works with the United States Copyright Office in 2016. *See* ECF No. 56-1, Exhibit A to Second Amended Complaint ("SAC") (providing the name, image, and copyright registration number of each Work); Moore Decl., Exs. 23-31 (copyright registrations). Mr. Davis has never granted Pinterest any license to copy, distribute, publicly display, or otherwise use any of his Works for commercial purposes. Davis Tr. 64:16-25; 65:1-25.

## II.     PINTEREST'S UNIFORM TREATMENT OF ALL PINNED IMAGES

Pinterest employs uniform technology with respect to images that are uploaded by its users.

### A.     Unauthorized Creation of Derivative Works

#### 1.     Pinterest Displays Only Contents that It Creates

As Pinterest's Senior Software Engineer and Fed. R. Civ. P. 30(b)(6) witness Nick DeChant explained, when content is "pinned" on Pinterest's websites or app, Pinterest saves that content on its servers in the original format, which it calls the ███████" Pinterest then creates derivative works from the ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████. Mr. DeChant testified as follows:

████████████████
███████████████
████████████████████
█████████████
████████████
████████████████
██████████████████████
█████████████████████████
███████████████████
████████████████████████
██████████████
████████████████████
██████████████████████████
████████
███████

1

2

3

4

5

6 Deposition Transcript of Nick Dechant ("DeChant Tr."), Moore Decl. Ex. 2, 30:24-32:1.

7

8

9     Mr. DeChant reiterated:

10

11

12

13

14

15

16

17

18

19 DeChant Tr. 46:23-47:16.

20     Thus, Pinterest's search engine does not search the Internet at large and does not display

21 search results that hyperlink to images as they are found on the Internet. It only searches among

22 Pinterest-created

23

24

25

26     Mr. DeChant also explained that Pinterest

27



28 [1] "* * *" generally indicates the omission of colloquy between counsel.

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████

4 ████████████████

5 DeChant Tr. 82:11-22.

6      Mr. DeChant confirmed that Pinterest ████████████████████

7 ████████████████████████████████████████████████████████

8 ████████████

9 *Id.* at 87:1-5.

### 2. Pinterest-Created Content Is Embedded with Pinterest's Data to Drive Pinterest Advertising Revenue

     Pinterest embeds ████████ with data that Pinterest's artificial intelligence uses to track a user's interaction with content on Pinterest's website and app. Pinterest also embeds ████████ with data so that Pinterest's artificial intelligence can serve users with engaging content that was originally uploaded by users and by Pinterest's advertising clients. Pinterest takes "raw signals" that are inherent in ████████ then transforms them and codes them ████████ to make them readable for Pinterest's artificial intelligence that Pinterest uses to display content to its users. *See* "How we use AutoML, Multi-task learning and Multi-tower models for Pinterest Ads" (PINTEREST 0002005-2017), Moore Decl. Ex. 8. Pinterest uses proprietary automated machine learning, *i.e.*, "AutoML," to "enable [it] to directly learn from raw features by applying a series of predefined feature transform rules." *Id.* at PINTEREST 0002006.

     With the creation of Pinterest's ████████ embedded with Pinterest's data, Pinterest uses its machine learning to display to its user what Pinterest calls "Organic Pins" (*i.e.*, ████████ derived from content that its users pinned) and "Promoted Pins" (*i.e.*, ████████ derived from content that advertisers pay Pinterest to promote), with the goal that both will be enticing to its users:

> People come to Pinterest in an exploration mindset, often engaging with ads the same way they do with organic Pins. Within ads our mission is to help Pinners go from inspiration to action by introducing them to the compelling products and services that advertisers have to offer. A core component of the ads marketplace is predicting engagement of Pinners based on the ads we show them. In addition to click prediction,

1    we look at how likely a user is to save or hide an ad. We make these predictions for
2    different types of ad formats (image, video, carousel) and in context of the user (e.g.,
     browsing the home feed, performing a search, or looking at a specific Pin.)

3    *Id.* at 0002005.

4         Ryan Galgon, Head of Ads Quality Product and Fed. R. Civ. P. 30(b)(6) witness, further

5    explained:



10   Deposition Transcript of Ryan Galgon ("Galgon Tr."), Moore Decl. Ex. 3, 55:22-55:7.

11       There is no question that Pinterest



19   DeChant Tr. 96:7-25; *see also* "Building expanded targeting for Pinterest ads" (PINTEREST

20   0001976-1984), Moore Decl. Ex. 9 ("With more than 300 million people coming to Pinterest each

21   month, Pinterest offers unique opportunities for advertisers to get their products in front of people

22   with commercial intent. Similar to other platforms, Pinterest offers a variety of advertising targeting

23   products. Advertisers can define a target audience based on Pinners' interests, keywords, device,

24   location, and more. When done well, targeting can deliver ads to the ideal audience and maximize

25   partners' value and return on investment (ROI), creating a good experience for everyone." (footnote

26   omitted)).

27       Pinterest's advertisement revenue is directly linked to Pinterest being able to engage its users

on its website and app. Mr. Galgon testified as follows:

Galgon Tr. 45:22-48:2.

As discussed in further detail below, users cannot

**B.    Unauthorized Public Display of Works with Advertisement**

Again, Pinterest does not display

As explained by Mr. Galgon,



Galgon Tr. 77:2-19.

Mr. Galgon was shown an exhibit in his deposition, Moore Decl. Ex. 10, and the questions and answers that follow refer to this deposition exhibit, which display Mr. Davis' "Kiss from a Rose," Work No. 15, on the top left row immediately adjacent to a decorative print of roses promoted by Chairish. The exhibit is excerpted here for ease of reference:



Mr. Galgon testified as follows:

Galgon Tr. 59:21-60:16 (emphasis added).

## C.    Unauthorized Display and Distribution of Works in Notifications

Notifications are an important facet of Pinterest's business strategy. As Pinterest stated:

> Notifications (including emails, mobile / desktop push notifications, SMS, etc.) are very effective channels for online services to engage with users and drive user engagement metrics and other business metrics.

"Notification Volume Control and Optimization System at Pinterest" (PINTEREST 0002095-2103), Moore Decl. Ex. 11, at PINTEREST 0002095. Pinterest further explained:

> There are multiple channels to send notifications, including emails, mobile push notifications, desktop push notifications, SMS, etc. If the content is relevant and the timing is right, notifications could serve as a natural extension of the core product and provide users with great experience. For example, emails allow casual users to view recommendation content directly in their email clients without logging into the site or installing the mobile app. Push notifications are also very effective to engage with more active users who have the Pinterest app on their phones.

*Id.* "At Pinterest, billions of notifications are sent every week to users and drive a significant portion of monthly active users." *Id.*

And just to be clear, because Pinterest only displays ███████████████ Pinterest's notifications do not link to any Internet web pages of the images' original source. Notifications only link to pages on Pinterest's own website. *See* Deposition Transcript of Kevin Kim, Product Manager of Notifications and Fed. R. Civ. P. 30(b)(6) witness ("Kim Tr."), Moore Decl. Ex 4, 82:6-9 (Q: "Mr. Kim, are you aware of any e-mail notification sent by Pinterest that contain the links to Web

1   pages that are not on Pinterest's Web site?" A: "As I sit here today, I don't know of any.").

2   ████████████████████████████████████████████

3   ████████████████████████████████████████████

4   ████████████████████████████████████████████

5   ████████████████████████████████████████████

6

7

8

9

10

11

12

13

14

15

16

17   *Id.* at 0002348; *see also* Kim Tr. 82:16-23, 83:23-25, 84:2-24, 85:1-23.

18       The purpose of the notifications sent by Pinterest is to ████████████████

19   ████████████████████████████████████

20   **III.   PINTEREST'S INFRINGING USES OF DAVIS' WORKS**

21       The evidence establishes beyond any reasonable dispute that Pinterest infringed Mr. Davis'

22   exclusive right to create derivative works under 17 U.S.C. § 106(2) when it created ████ from Mr.

23   Davis' Works, infringed Mr. Davis' exclusive display rights under 17 U.S.C. § 106(5) when it

24   displayed the Works in connection with advertisement, and infringed Mr. Davis' exclusive display

25   rights under 17 U.S.C. § 106(5) and his distribution rights under § 106(3) by sending to its users

26   notifications that incorporated the Works.

27       Pinterest itself produced irrefutable evidence that Mr. Davis' Works were pinned by users.

28   ████████████████████████████████████████████

9



*See* Moore Decl. at ¶¶ 19-30, Exs. 16-19.

*See* Moore Decl. at ¶¶ 21-22,

. *See id.* at ¶¶ 23-24, 29.

As discussed in greater detail below, this information can only be deciphered from Pinterest's belated production of information on September 10, 2021 by cross-referencing numerous documents.

## IV.   PINTEREST'S FLAWED DMCA TAKEDOWN PROCEDURE

### A.   Pinterest's Takedown Procedure Does Not Address Its Own Infringement

Pinterest makes much of the fact that Mr. Davis sent a limited number of DMCA takedown notices even though Mr. Davis was aware of the extensive use by Pinterest of his Works. *See* Pinterest's Answer, ECF No. 77, Seventh Defense (Failure to Mitigate), Eleventh Defense (Waiver). However, as Pinterest's own testimony and documents make clear, Pinterest's copyright policy and DMCA takedown process addresses only requests to take down infringing content posted by Pinterest users (*i.e.*, Pins), not the use of the image by Pinterest itself. *See generally* "Copyright on Pinterest" (PINTEREST 0000003-07), Moore Decl. Ex. 20, at PINTEREST 0000004 ("If the work you're reporting is an image, you can ask us to remove all copies of the image. At the beginning of your notice, just ask us to 'remove all Pins that contain the image.'").

1    Henry Lien, Assistant General Counsel for IP and Content and a Fed. R. Civ. P. 30(b)(6)

2    witness, testified that, for purposes of DMCA takedown notices, Pinterest does not consider Pins to

3    be the same as the images Pinterest itself displays alongside advertisement. *See* Deposition Transcript

4    of Henry Lien as 30(b)(6) witness ("Lien Corporate Tr."), Moore Decl. Ex. 5, at 106:11-107:15. Mr.

5    Lien also was shown the same Exhibit 3 in his deposition as Mr. Galgon discussed above, Moore

6    Decl Ex. 10. He was asked to focus on the juxtaposition of the image on the top right, labeled "Kiss

7    from a Rose," with advertisement "White Tea Roses by Neicy Frey in White Frame, Small Art Print"

8    sold by Chairish immediately to the right. The exhibit again is excerpted here for ease of reference:

9



23   Mr. Lien testified as follows with respect to this deposition Exhibit:

24   Q: . . . So assuming that the request DMCA takedown notice did say remove all
     and since it is of this image, would Pinterest both remove the original pin and the
25   thumbnail or just the original pin?

26                                    * * *

27   A: So if the notice asked to remove all and we treated it as a remove all and if it
     was a complete notice and we were processing the removal, **the removal would**
28   **cause the pin that was identified to be removed**. It would cause any exact

matches we identified of the image that was in the identified pin to be removed. **I believe that would also cause -- because the pins are removed we would no longer be showing the pin in thumbnail form on the platform and so we wouldn't be displaying the thumbnails like what I'm assuming is appearing in Exhibit 3.**

Q: As part of the DMCA takedown notice process at Pinterest can a copyright holder ask for a thumbnail to be taken down without asking for the original pin to be taken down?

\* \* \*

**A: So I think if the notice identified a specific pin URL then that would cause the pin to be removed, which would then prevent the pin from being displayed either in close-up or in thumbnail form.**

Lien Corporate Tr. 106:11-107:15 (emphasis added).

Thus, there was no avenue under Pinterest's DMCA takedown procedure for Mr. Davis to object to Pinterest's commercial use of his Works but not request that the underlying Pin be taken down. So, for example, if a user pinned Mr. Davis's "Kiss from a Rose," (Work No. 15 in the SAC), in order to comment on it, criticize it, research it, or write a journalistic piece about it, Mr. Davis would not have a legitimate basis to request that Pinterest take that Pin down under Pinterest's DMCA takedown mechanism because he would not have a "good faith belief" that the original Pin of his Works "is not authorized . . . by the law." *See* "Copyright on Pinterest," Moore Decl. Ex. 20, at PINTEREST 000004. However, Mr. Davis does and did object to Pinterest's use of his Work in making derivative works to track user interaction with his Works, publicly displaying his Works in connection with advertising products, and distributing his Works to promote Pinterest, all for Pinterest's own commercial purposes. Because Mr. Davis only can seek to take down Pins under Pinterest's DMCA takedown procedure, Mr. Davis' allegations of Pinterest's direct infringement of his Works, which does not center on users' Pins, are in no way affected by his refusal to engage with a burdensome process that would not give him substantive relief.

Mr. Davis testified:

Q: Did you send Pinterest DMCA takedown notices for every image of yours on Pinterest that you were aware of at the time in roughly September 2015?

A. Absolutely not.

Q. Why did you send a DMCA notice to Pinterest requesting removal of this one image in September of 2015 and not others of your images that you were aware of appearing on Pinterest at roughly the same time?

1   A. I believe I've already answered that two-part question. The two parts are that I
    did not embark on what would be a fool's journey and would occupy me full-time
2   for the rest of my life of sending takedown notices for every use of my images on
    Pinterest, so that's why I didn't send it for every single image or every single
3   infringement of those images. And the other was that I was just trying to figure
    out how this worked and how practical it was to do. The hope was that an
4   automated system might make it something that was in some way feasible.

5   Davis Tr. 155:6-24; *see also id.* at 283:5-8 ("I have explained to you before that I do not regard

6   individual users as the copyright infringers here. I regard Pinterest, the corporation who makes profit

7   off my images, as the infringer."); Deposition Transcript of Henry Lien in his individual capacity

8   ("Lien Individual Tr."), Moore Decl. Ex. 6, 10:13-19 ███████████████████

9   ████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████

11  ██████████████████████████████████████████ (emphasis added)).

12      **B.    Pinterest's DMCA Take Down Procedure Is Not Meaningful to
                Professional Photographers Like Mr. Davis**
13

14      ████████████████████████████████████████████████████

15  ██████████████████████████, Defendant is loath to disable them or otherwise limit their use.

16  Pinterest deliberately limited its DMCA takedown process to be as narrow as possible, even though

17  nothing in the DMCA so required. Thus, Pinterest required the identification of specific URLs or Pin

18  IDs[2] in order to process the DMCA takedown notice ████████████████████

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21  ████████████████████████████

22

23

24

25

26

_____

27  [2] Pin ID is a numerical value that Pinterest assigns to a Pin and is found at the end of the URL of a
    Pin such as the "12345" in the example URL: URL https://www.pinterest.com/pin/12345/
28



*Id.* at 1003.

Lien Corporate Tr. 56:20-24.

Moreover, even when someone requested that Pinterest "remove all copies of the image," or whatever magic words he or she must say to trigger Pinterest's "remove all" functionality, Pinterest removed only those images that were "identical" or "exact matches" to the Pin identified by URL, which in the context of Pinterest's DMCA takedown process has a highly technical meaning:

> Q: So you've used the term today "exact matches" when discussing if somebody wants their copyright image removed from Pinterest platform wherever it appears. What did you mean by that term "exact match" in that context?
>
> A: So in that context what I mean by exact match is that you have two image files that are exactly the same bit for bit, so every bit of that image file is completely identical. So if there's any bit that's slightly different, then it would not be an exact match.

*Id.* at 85:25-86:9. Mr. Lien further testified:

> Q: And what do you mean by "exact matches" that you just used in that answer?
>
> A: So by exact matches I mean images where the MD5-hash value is identical to the other image, the MD5-hash of the other image.

*Id.* at 95:15-19. And, further:

> Q: Is the thumbnail an exact match of the image as pinned by the pinner?
>
> * * *
>
> A: By "exact match" do you mean the way I used it before as a match using MD5?
>
> Q. Yes.
>
> A: So I think it would depend on the specific instance. I think in general the thumbnail -- the image that we would serve as a thumbnail image would not be an exact match to the image originally saved because the resolution might be different. And like I mentioned before, if there's any change at all in the bits of the particular image, then it wouldn't be matched as an exact match.

*Id.* at 102:23-103:14.

Thus, for a professional photographer like Mr. Davis with thousands of works, Pinterest's DMCA takedown notice procedures are not feasible. *See* Davis Tr. 150:17-23 ("And the idea is that since for somebody with many images in the situation like mine, it would be practically impossible for me to do manual takedown notices using a form at Pinterest. I would spend the rest of my life doing that and never make another photograph. So it's not really a practical process to send individual forms."). Indeed, Pinterest deliberately designed a process ▮▮▮▮▮▮▮▮ to render it

15

exceedingly difficult for copyright holders to effectively address rampant infringement of their copyrights on Pinterest's website.

### C.   Pinterest Did Not Offer Any Other Meaningful Remedies to Mr. Davis

Pinterest also suggests that Mr. Davis somehow did something improper when he refused Pinterest's offer to assist him outside its DMCA takedown procedure. *See* Pinterest's Answer, ECF No. 77, Sixth Defense (Unclean Hands), Seventh Defense (Failure to Mitigate), Eleventh Defense (Waiver). Of course, discovery has made it abundantly clear that



Mr. Lien testified that

Lien Corporate Tr. 119:6-120:9.

In other words, Pinterest asked Mr. Davis to spend his time helping Pinterest come up with a way of removing his images through reference files, which may or may not work. Mr. Davis testified to the enormity and complexity of providing such reference files to Pinterest:

> Q: How long would it have taken you, sir – if this was what you contemplated, how long would it have taken you to provide Pinterest with electronic copies of the images you've uploaded to Flickr?
>
> * * *
>
> A: Two years full-time.

1      Q: I'm sorry?

2      A: Two years full-time, five years full-time, I really don't know. Lots and lots and lots of uncompensated time.

3      Q. Do you not have copies of your images in raw form anywhere stored?

4                    * * *

5      A: Yes, I have copies of my images in raw format.

    Q: How are they stored, sir?

6      A. . . . The digital asset management and workflow of a professional photographer
7      is a rather complex subject. They are stored in network-attached storage devices for the most part in chronologic volumes in files organized by reproduction sizes
8      and various other criteria. The appropriate files that I could have loaded up for this purpose would need to be generated in each case, compiled, inventoried,
9      archived, and I -- I -- I mean I don't think you could -- I mean I don't think you could even begin to contemplate the amount of work involved. . . .

10  Davis Tr. 264:16-265:22. Given the uncompensated time and effort he would have had to expend

11  and Pinterest's questionable ability to actually remove his images, Mr. Davis declined to be

12  Pinterest's guinea pig. *Id.* at 262:5-9 ("When I actually talked to the people in the conversation, they

13  indicated, A, that tool didn't exist yet, and B, there is a -- the same kind of sham problem involved

14  with using it that, what am I going to do, produce 10,000 thumbnails and send them in?").

15  

16  

17  

18  

19  Of course, Pinterest's DMCA takedown process

20  

21  

22  

23  

24  

25  

26  

27  

28

1

2        Lien Individual Tr. 20:12-21:4.

3

4   **V.    PINTEREST'S HINDRANCE OF PLAINTIFF IN GATHERING EVIDENCE OF
            INFRINGEMENT AND WILLFUL BLINDNESS TO THE COPYRIGHTS OF
            PROFESSIONAL PHOTOGRAPHERS**

5

6        **A.    Pinterest Hindered Plaintiff's Ability to Gather Evidence of
                 Infringement in This Case**

7        On December 16, 2020, Mr. Davis posed the following Interrogatory No. 6:

8            Identify every instance in which Works have been Pinned, uploaded, downloaded,
             displayed or otherwise used on or through the Pinterest Platform. If you cannot
9            identify every instance, explain why.

10       In response, Pinterest initially stated in relevant part:

11           Plaintiff has not provided uniform resource locators (URLs) or Pin IDs for alleged
             infringements on Pinterest of the 51 images that he claims are at issue in the SAC.
12           Without such information, Pinterest does not know whether the images that
             Plaintiff claims to own and claims are at issue can be found among the billions of
             images that users have posted on the Pinterest service.

13

14       Pinterest's Reponses and Objections to Plaintiff Harold Davis' First Set of Interrogatories (Nos. 1-

15       7), dated February 1, 2021, Moore Decl. Ex. 13, at 17. Depositions of Pinterest's witnesses, however,

16       confirmed that Pinterest, in fact, could locate on its website uses of Mr. Davis' Works using

17       Pinterest's near duplication algorithm using the images of the Works, already provided in the SAC,

18       without the need for URLs or Pin IDs—near-duplication technology that Pinterest had in one form

19       or another at least since the filing of the SAC. *See, e.g.*, Lien Corporate Tr. at 120:23-121:7.

20              After it became clear that Pinterest would not supplement its response to Interrogatory No. 6

21       and would not produce relevant documents, Plaintiff filed a motion to compel. Magistrate Judge

22       Hixson ordered Pinterest to provide proper responses to Plaintiff's discovery requests: "[T]he issue

23       presented in this motion to compel is that Pinterest is refusing to do any searching for documents or

24       information in response to these discovery request unless and until Davis identifies the specific

25       location of each instance of his works, and the Court overrules that objection." Discovery Order

26       dated July 20, 2021, ECF No. 109, at 5 (ordering Pinterest to produce responsive documents to

27       Plaintiff's request for production Nos. 1-11 and 23-24 and Interrogatory No. 6 within 30 days of

28       Order, *i.e.*, August 19, 2021).

On August 19, 2021, after the June 1, 2021 deadline by which Plaintiff had to identify all instances of infringement and after the July 2, 2021 close of discovery,[3] Pinterest belatedly produced a Supplemental Response to Interrogatory No. 6 and produced PINTEREST-0002756-2887, 0002934-2945, 0003002-3364, 0003356-3986. *See* Pinterest's Third Supplemental Response and Objections to Plaintiff Harold Davis' First Set of Interrogatories (Nos. 1-7), Moore Decl. Ex. 14, at 16-20. In that interrogatory response verified by Henry Lien, *id.* at 22, Pinterest stated, among other things, that PINTEREST 0002756-2887 and PINTEREST 0003002-3364 are documents that "show, for each Pin that contained a duplicate or near duplicate of an image that Plaintiff has identified as being a work in suit: (1) the board to which it was pinned; (2) whether and how often the Pin was re-pinned; (3) occasions on which the Pin appeared on a Pinterest surface (e.g., homefeed); (4) the date(s) associated with those activities; and (5) the third-party web domain to which the Pin links, to the extent such documents exist in a readily accessible format in Defendant's possession, custody, or control based on a reasonable search and diligent inquiry." *Id.* at 18-19. But rather than produce responses for the entirety of the relevant period—or even since the filing of the lawsuit—Pinterest chose to limit its search to just the week pre-dating the filing of the Amended Complaint (March 4, 2020 to March 10, 2020) and the week pre-dating the filing of the SAC (November 4, 2020 to November 10, 2020). *Id.* at 19. This temporal limitation was never discussed by the parties or allowed by the Court; it was the unilateral decision of Pinterest.

Defendant also produced PINTEREST 0002934-0002945 and PINTEREST 0003365-0003986 on August 19, 2021, after the discovery deadline, which Pinterest identified as "documents that show, for each Pin that contained a duplicate or near duplicate of an image that Plaintiff has identified as being a work in suit: (1) the date(s) on which a notification that linked to the Pin was sent to a user; (2) redacted user account(s) to which the notification was sent; and (3) the type of notification that was sent, to the extent such documents exist in a readily accessible format in Defendant's possession, custody, or control based on a reasonable search and diligent inquiry." *Id.*

[3] This Court's Scheduling Order set June 1, 2021 as "Deadline for Plaintiff to Serve Final Identification of Alleged Infringements" and set July 2, 2021 as the "Close of Fact Discovery." The Scheduling Order, however, allowed Defendant to "pursue discovery regarding alleged infringements through September 3, 2021." ECF No. 63.

1    at 19. Again, Defendant unilaterally set a temporal limitation. For information regarding the Works

2    Pinterest displayed and distributed in notifications, it produced data from two years pre-dating the

3    filing of the Second Amended Complaint. *Id.*

4         Importantly, all of the documents produced by Pinterest on August 19, 2021 were

5    indecipherable because the only information identifying the Works referenced in those documents

6    was the "pin_image_signature," a string of letters and numbers associated with a specific image and

7    meaningful only to Pinterest. It was not until September 10, 2021, that Pinterest finally produced its

8    Fourth Supplemental Response to Interrogatory No. 6, attaching the key to these documents: (A) a

9    list of "native images" produced by Pinterest in certain documents corresponding to (B) its

10   "pin_image_signatures." *See* Exhibit A to Pinterest's Fourth Supplemental Responses and

11   Objections to Plaintiff Harold Davis' First Set of Interrogatories (Nos. 1-7), Moore Decl. Ex. 15.

12   Given Pinterest's hide-the-ball interrogatory responses and document production, Plaintiff was

13   forced to take multiple steps to understand which Pin Image Signature corresponds to which Work.

14   Plaintiff had to locate the documents displaying "native images," which were identified in Ex. A to

15   the Fourth Supplemental Response, then visually match the images in Pinterest's documents to the

16   images of the Works listed in Exhibit A to the Second Amended Complaint.[4] Only then could

17   Plaintiff understand when, how, and how many times Pinterest had used his Works based on

18   Defendant's August 19, 2021 document production. *See* Moore Decl. ¶¶ 17-30.

19        On August 26, 2021, Magistrate Judge Hixson ordered that Plaintiff could proceed with a

20   deposition of Pinterest's corporate witness pursuant to Fed. R. Civ. P. 30(b)(6) regarding Pinterest's

21   potential spoliation of evidence. ECF No. 122. Pinterest produced Mr. Lien as this witness. His

22   deposition on September 29, 2021 confirmed what Plaintiff already suspected.

25                                         Deposition Transcript of Henry Lien ("Lien

26   Spoliation Tr."), Moore Decl. Ex. 7, at 13:2-14:4; 31:24-32:6; 63:17-64:10.

[4] "[T]he burden of deriving or ascertaining the answer" to this interrogatory is substantially the same for Plaintiff as it would have been for Pinterest. This calls into question Pinterest's invocation of Fed. R. Civ. P. 33(d) in citing documents rather than responding to Interrogatory No. 6.

1      The following is just one screenshot of infringement, DAVIS 00004346, of the many URLs

2  of infringement that Plaintiff produced in discovery, which then Pinterest used to identify the

3  underlying Pins displaying Mr. Davis' Works and render these Pins inaccessible. Moore Decl., Ex.

4  22.



18      This screen shot of the identified URL captured Pinterest's display in the "More like this"

19  surface several of Mr. Davis' Works in connection with advertisement. Among other Works, Mr.

20  Davis' "Two Icelandic Poppies," identified as Work No. 12 in Exhibit A to the SAC, No. 56-1, can

21  be seen on the far top left below the "More like this" caption, immediately next to wall art sold by

22  West Elm. Mr. Davis' "Flowering Quince," identified as Work No. 40, also can be seen immediately

23  next to a Promoted Pin for Hydro Flask, on the far top right below the "More like this" caption. It is

24  important to note that the image that is Pinned and displayed **above** the "More like this" caption is

25  **not** the instance of infringement that Mr. Davis identified. Mr. Davis has repeatedly stated in his

26  SAC, deposition, verified responses to interrogatories, and requests for admissions that his claim of

27  direct infringement centers on **Pinterest's** volitional actions that violated Plaintiff's exclusive

28  copyrights with respect to each Work, **not** the uploading of content by Pinterest's users to their

1    boards, *i.e.*, Pins. Again, the screen shot above is just one example of the many identifications of

2    infringement by Plaintiff that Pinterest then used to disable access to content on its website.

3          Even after having disabling access to Pinterest's display of the Works specifically using

4    Plaintiff's identification of instances of infringement, Pinterest answered Interrogatory No. 6 in part

5    as follows: "Defendant's keyword search functionality is readily available to Plaintiff, who is in a

6    considerably better position than Defendant to devise and conduct keyword searches and determine

7    from the thousands of results whether he believes a particular image on Pinterest is in fact his work."

8    Moore Decl. Ex. 14 at 18. However, Mr. Lien's testimony



9

10

11

12

13    Lien Spoliation Tr. at 40:12-22.

14          Mr. Lien's testimony also                    Pinterest's verified response to Interrogatory No.

15    6 that extracting information regarding the display of Mr. Davis' Works "for all Pins located through

16    exact and near-duplicate searches for more than a narrow time period would require a team of

17    engineers and significant computational power, and would cost hundreds of thousands, if not

18    millions, of dollars" and that extracting information regarding the display and distribution of Mr.

19    Davis' Work in notifications for "all Pins located through exact and near-duplicate searches for more

20    than a two-year period predating the query would require Defendant to develop new tooling

21    capabilities to assemble data held in significantly less accessible archival storage of raw data—a

22    process that could take weeks of engineering work and cost hundreds of thousands, if not millions,

23    of dollars." Moore Decl. Ex. 14 at 19. When asked about the bases for Pinterest's representations

24    regarding the burdens of production in response to Interrogatory No. 6, which he verified, Mr. Lien

25

26

27

28

1

2

3

Lien Spoliation Tr. at 56:22-57:6.

With dubious objections and responses to Plaintiff's discovery requests, Pinterest actively sought to hinder Plaintiff's efforts to obtain discovery of its infringement and authenticate his evidence of infringement. Moreover, Pinterest abused this Court's requirement that Plaintiff identify all instances of infringement by a date before Pinterest was required to produce its discovery. It did not use such identification to "pursue discovery regarding alleged infringements" as allowed by this Court in its Scheduling Order, ECF No. 63; Pinterest used the identification to obfuscate evidence of its infringement.

**B.**     **Pinterest Is Willfully Blind to the Copyrights of Professional Photographers**

Not only did Pinterest hinder Mr. Davis' efforts to enforce his copyrights in this litigation, but it acted with willful blindness to the copyrights of other professional photographers.

DeChant Tr. 43:23-44:5.

Pinterest initially claimed that the only manner in which it could identify Mr. Davis' works displayed on its website and app would be for Mr. Davis to provide specific URL addresses or Pin

1   IDs. Moore Decl. Ex. 13 at 17 (Response to Interrogatory No. 6). This turned out to be untrue. After

2   being ordered by Judge Hixson to produce the requested information and documents, Pinterest

3   amended its response to Interrogatory No. 6 in part as follows:

> There are billions of images accessible on the Pinterest service. While the service
> offers a public-facing keyword search capability, that search capability does not
> use image-matching technology. Conducting manual keyword searches of the
> corpus of images on the service using search terms that Defendant would have to
> devise in the hopes of finding images that match the works that Plaintiff has put
> at issue in this case would not only be an enormously time consuming process,
> but would generate highly over- and potentially under-inclusive results. **That is
> especially so since the persons charged with performing these searches would
> have to review many thousands of results for each search and would not know
> by looking at a given image in the results whether it was in fact one of the
> specific works that Plaintiff has put at issue and that this Interrogatory seeks
> information about.**

11   Ex. 14 at 17-18 (emphasis added).

12         In other words, the only reason Pinterest could claim in this copyright litigation that it "does

13   not know whether the images that Plaintiff claims to own and claims are at issue can be found among

14   the billions of images that users have posted on the Pinterest service" and claim that textual searches

15   would require someone to "review many thousands of results for each search [by someone who]

16   would not know by looking at a given image in the results whether it was in fact one of the specific

17   works that Plaintiff has put at issue" is because ████████████████████████████████████

18   ██████████████████████████████████████  The very purpose of the IPTC

19   Metadata that Plaintiff and other professional photographers embed into their image is to easily and

20   conclusively identify their copyrighted works and enforce their copyrights. *See* Davis Tr. 12:3-11

21   (Q. "[Y]ou can tell by just looking at an image that it is an image you created, correct?" A. "I cannot --

22   I cannot tell. It depends on the image, honestly, and I cannot necessarily tell with a hundred percent

23   certainty. With these images, certainly I can tell. There are occasions where it can be a little more

24   difficult than meets the eye to make that determination.").

25         Even though Pinterest knew copyright infringement was occurring on its website, Pinterest

26   ███████████████████████████████████████████████████████████████████████████████

27   ███████████████████████████████.  Thus, Pinterest could claim ignorance of its

28   infringement of copyrighted images, to avoid █████████████████████████████

1    ██████████████████ and to thwart the enforcement of copyrights. ██████████████

2    █████████████████ it would not need specific URLs or Pin IDs in order to execute takedown notices

3    or respond to discovery requests. It would not need complex image-matching technology (which may

4    nonetheless misidentify images) to locate copyrighted works on its websites and app. Photographers,

5    who are copyright holders, could identify their work, not merely by sight, but ████████████████

6    ██████████████████████████████████████████████████████████

7    ██████████████████████████████████████████████████████████

8    ██████████████████████████████████████████████

9        There is evidence in this case that supports the finding that Pinterest was willfully blind to

10   the copyrights of professional photographers like Mr. Davis.

11                                    **LEGAL STANDARD**

12       A party may move for summary judgment as to a claim or defense or part of a claim or

13   defense. Fed. R. Civ. P. 56(a). Summary judgment is appropriate where the court is satisfied that

14   there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

15   of law." *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that may

16   affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine

17   dispute of material fact exists only if "the evidence is such that a reasonable jury could return a

18   verdict for the nonmoving party." *Id.* Under Federal Rule of Civil Procedure 56(c), a party moving

19   for summary judgment bears the initial burden of identifying those portions of the record showing

20   the absence of a genuine issue of material fact. Once the moving party has made its threshold

21   showing, the burden shifts to the nonmoving party to prove the existence of a genuine dispute of

22   material fact regarding that element of the cause of action or defense. *Anderson*, 477 U.S. at 250.

23       Here, Pinterest admits ████████████████████████████████████████

24   ██████████████████████████████████████████████████████████

25   █████████████████████ In addition, the undisputed facts show that no reasonable jury could find

26   that this copying was fair use or entitled to the DMCA safe harbor; that Plaintiff licensed the Works

27   to Pinterest; or any of the other affirmative defenses that Pinterest has asserted. Partial summary

28   judgment on Mr. Davis' copyright claim should therefore be granted.

1

### ARGUMENT

2

**I.      THERE ARE NO GENUINE ISSUES OF FACT WITH RESPECT TO LIABILITY**

3          "Plaintiffs must satisfy two requirements to present a prima facie case of direct infringement:

4     (1) they must show ownership of the allegedly infringed material and (2) they must demonstrate that

5     the alleged infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C.

6     § 106." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1159 (9th Cir. 2007) (quoting *A & M*

7     *Records v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001)). There are no genuine issues of fact

8     with respect to these two elements of Mr. Davis' claim.

9          **A.      Mr. Davis Holds Valid Copyright Registrations**

10         Pinterest cannot raise a genuine dispute that Mr. Davis owns the copyrights in the Works, as

11    Mr. Davis has provided copyright registration numbers and produced certificates covering those

12    Works. *See* ECF No. 56-1, Exhibit A to SAC (providing the name, image, and registration number

13    of each Work); Moore Decl. Exs. 23-31. A "certificate of a registration made before or within five

14    years after first publication of the work shall constitute prima facie evidence of the validity of the

15    copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c).

16         **B.      Pinterest Violated Mr. Davis' Exclusive Rights Under the Copyright Act**

17         Pinterest itself produced records, albeit for a limited period of time within the statute of

18    limitations, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Moore Decl. ¶¶ 19-30, Exs. 16-19. Pinterest does not

21    publicly display any images as originally uploaded by its users but rather displays only ▮▮▮▮▮▮

22    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

24         Thus, Pinterest cannot raise a genuine dispute whether it directly and without authorization

25    created derivative works from the Works, displayed the Works, or distributed the Works in violation

26    of Mr. Davis' exclusive rights under 17 U.S.C. § 106. *See Perfect 10*, 508 F.3d at 1159-1163. The

27    only question is whether Pinterest has a defense for these unauthorized uses.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.   THERE ARE NO GENUINE ISSUES OF FACT THAT PINTEREST LACKS VIABLE DEFENSES

Once the alleged infringing acts are established by the plaintiff, the burden shifts to the defendant to establish any affirmative defenses. *See Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 590-94, n.20 (1994) (defendant bore the burden on fair use defense to copyright infringement); *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1039 (9th Cir. 2013) (DMCA safe harbor is an affirmative defense on which defendant has the burden of establishing its requirements); *Napster*, 239 F.3d at 1026 (waiver, implied license and copyright misuse are all affirmative defenses to a claim of copyright infringement on which the defendant bears the burden of proof); *Rano v. Sipa Press, Inc.*, 987 F.2d 580, 585 (9th Cir. 1993) (defendant may assert license as an affirmative defense to a claim of copyright infringement).

In Pinterest's Answer to Plaintiff's Harold Davis' SAC ("Answer"), ECF No. 77, it asserted ten affirmative defenses.[5] Pinterest's Second Defense is that Plaintiff's claims are barred in whole or in part because Defendant is protected by the DMCA Safe Harbors set out in 17 U.S.C. § 512(c) and (d). Its Third Defense is that Plaintiff granted licenses, consents, or permissions to Pinterest. Its Fourth Defense that Pinterest's "activity is not infringing to the extent that it constitutes a fair use of the underlying copyrighted material." Its Fifth Defense is estoppel that "Defendant has relied on representations from Plaintiff about Pinterest's authorization to use all of portions of the copyrighted works at issue." Pinterest's Sixth Defense is unclean hands that he has somehow "manufacture[d] certain claims in this litigation." Pinterest's Seventh Defense is failure to mitigate his damages by failing to use Defendant's DMCA takedown process. Pinterest's Eighth Defense is that Plaintiff's claims are barred in whole or in part by the applicable three-year statute of limitations. Pinterest's Ninth Defense and Tenth Defense is that Pinterest's activities are substantially non-infringing and constitute *de minimus* use of the underlying copyrighted material. Finally, Pinterest's Eleventh Defense is that Plaintiff somehow waived his copyright infringement claim because "Plaintiff refused to submit DMCA takedown notices and rejected Defendant's requests for the information necessary to identify and remove those alleged infringements, stating that he would not benefit from

---

[5] Defendant asserted as its first defense that Plaintiff's SAC fails to state a claim for copyright infringement. Answer, ECF No. 77, at 15. This is not an affirmative defense.

1     the removal of his images from Pinterest." *See* Answer, ECF No. 77 at 15-18. There is no genuine

2     issue that Pinterest has no viable affirmative defenses.

3         **A.     Pinterest's Uses of Mr. Davis' Works Do Not Constitute Fair Use**

4             Pinterest claims that it is somehow entitled to a fair use defense under 17 U.S.C. § 107,

5     despite the fact that it has taken the entirety of each of the artistic Works, minimally transformed

6     them primarily to make them more effective for Pinterest's advertisement and, in so doing,

7     supplanted Mr. Davis' actual and potential market to license his photographic images. That simply

8     cannot be the case. Indeed, the Ninth Circuit has already held that fair use is not a defense under very

9     similar circumstances in *VHT, Inc. v. Zillow Group, Inc.*, 918 F.3d 723 (9th Cir. 2019).

10            In *VHT*, the Ninth Circuit concluded that use of professional photographers' images on the

11    defendant Zillow's search engine, Digs, was not fair use under the four factors courts consider:

12                (1) the purpose and character of the use, including whether such use is of a
13                commercial nature or is for nonprofit educational purposes;

14                (2) the nature of the copyrighted work;

15                (3) the amount and substantiality of the portion used in relation to the copyrighted
      work as a whole; and

16                (4) the effect of the use upon the potential market for or value of the copyrighted
17                work.

18    *Id.* at 739 (citing 17 U.S.C. § 107).

19            The Ninth Circuit then examined the search engine at issue, Digs, which has many of the

20    same commercial functions as Pinterest's website.

21            With respect to the first factor, just as here, "[t]here is no dispute that [the defendant's] use

      is for commercial purposes, a factor [the Court] cannot ignore." *Id.* at 742. Moreover, just as in

22    Zillow, Pinterest's use of Mr. Davis' work is not sufficiently "transformative" to mitigate the purely

23    commercial nature of Pinterest's use. *Id.* at 742-3.

24

25                Unlike the internet-wide search engines considered in *Amazon* and *Kelly*, Digs is
      a closed-universe search engine that does not "crawl" the web. Users can run
26                searches on the "searchable set" of images within Digs' walled garden, which
      includes VHT photos. The search results do not direct users to the original sources
27                of the photos, such as VHT's website. Rather, they link to other pages within
      Zillow's website and, in some cases, to third-party merchants that sell items
28

similar to those featured in the photo.

> That Digs makes these images searchable does not fundamentally change their original purpose by VHT: to artfully depict rooms and properties. Additionally, Digs displays the entire VHT image, not merely a thumbnail. . . . [T]he new image does not serve a different function than the old one. Zillow's use preserves the photos' inherent character. And Zillow simply supersedes VHT's purpose in creating the images in the first place.

*Id.* at 742-43 (internal quotation, citation and edits omitted).

With respect to the second factor, the Ninth Circuit concluded that photographers' images are creative and thus closer to the core of the intended copyright protection. *Id.* at 743-44. With respect to the third factor, the Ninth Circuit concluded that nothing justified Zillow's display of VHT's photos in full on Digs, unlike in other cases where courts found that copying full works was necessary "to allow users to recognize the image and decide whether to pursue more information about the image or the originating web site." *Id.* at 744. Finally, the Ninth Circuit concluded that the Zillow's copying adversely affected the potential market for the copyrighted work because VHT licensed its photos. *Id.* Rather than using the label "search engine" as "a talismanic term that serves as an on-off switch as to fair use," *id.* at 742, the Ninth Circuit considered the details and function of the website at issue and determined that the use of the plaintiff's photographs on Digs was not fair use. *Id.* at 744.

This case is on all fours with *VHT*.

Just like Zillow's Digs, Pinterest offers a "closed-universe search engine that does not 'crawl' the web." *VHT*, 918 F.3d at 742; *see*

"The search results do not direct users to the original sources of the photos," such as Plaintiff's website. *VHT*, 918 F.3d at 742;

Any search results "link to other pages within [Pinterest]'s website and, in some cases, to third-party merchants that sell items similar to those featured in the photo." *VHT*, 918 F.3d at 742. Thus, Pinterest's display of Plaintiff's works "does not fundamentally change Plaintiff's original purpose," *id.*, in creating and displaying those works to provide visual interest and aesthetic pleasure. Without compensation to Plaintiff, Pinterest harnesses the eye-catching beauty of Plaintiff's photographs to generate ad revenue for itself. Pinterest's use is highly exploitative and intended to save the expense of purchasing authorized copies. *See Napster*, 239 F.3d at 1015 ("[C]ommercial use is demonstrated by a showing that repeated and exploitative unauthorized copies of copyrighted works were made to save the expense of purchasing authorized copies."). Pinterest would make less profit if it actually had to obtain licenses for the copyrighted works that Pinterest uses to generate advertisement revenue. As Mr. Davis testified, "My belief is that I've lost considerable licensing business due to my images appearing on Pinterest . . . furthermore, it's my right to decide with my images where they should be displayed and where they should not be displayed; and I'm particularly unwilling to have my images serve as advertisements for various products." Davis Tr. 268:9-17.

In sum, all four factors weigh against fair use. Defendants' copyright infringement of the Mr. Davis' Works is unexcused as fair use.

### B.     Pinterest Is Not Entitled to the DMCA Safe Harbor

Pinterest cannot escape liability under cover of the "safe harbor" provision of the DMCA. As an initial matter, 17 U.S.C. § 512(c) is applicable only with respect to "infringement of copyright by reason of the storage **at the direction of a user** of material that resides on a system or network controlled or operated by or for the service provider." As discussed above, Mr. Davis allegations of infringement has nothing to do with Pinterest's storage and use of his images "at the direction" of a Pinner. Mr. Davis' infringement claim is aimed at what Pinterest itself does with his Works for purposes of generating advertisement revenue, not any conduct that is directed by the user.

A service provider also is excluded from the § 512(c) and (d) if it (1) has the "right and ability to control" the infringing activity, and (2) receives "a financial benefit directly attributable to the infringing activity." 17 U.S.C. § 512(c)(1)(B), (d)(2).

1    There is no question that Pinterest receives financial benefit directly attributable to the

2    infringing activity. *See Fung*, 710 F.3d at 1045 ("the connection between the infringing activity and

3    Fung's income stream derived from advertising is sufficiently direct to meet the direct 'financial

4    benefit' prong of § 512(c)(1)(B)"). And there is no question that Pinterest has the "right and ability

5    to control" the infringing activity. Pinterest's ability to control infringing activity on its website and

6    apps go "well beyond merely locating and terminating users' access to infringing material." *Fung*,

7    710 F.3d at 1046.

8    Pinterest has sole control over the data that it embeds onto the derivative works that it creates

9    from content that its users upload to Pinterest's website.

10

11

12

13    Pinterest also has sole control over how it displays Organic Pins and Promoted Pins.

14

15

16

17

18

19

20

21    Moreover,

22

23

24    Moore Decl. Ex. 12.

25    There are no genuine issues of fact that Pinterest has the right and ability to control the

26    infringing activity and receives a financial benefit directly attributable to that infringing activity.

27    Accordingly, Pinterest does not qualify for safe harbor under the DMCA.

28

C.      **Pinterest Cannot Prove Its Remaining Affirmative Defenses**

There is no evidence that Pinterest used the Works under a licensing agreement. There is no evidence that either Mr. Davis or his agents represented to Pinterest that it was authorized to use all or portions of his Works. Although Mr. Davis and others on his behalf investigated Pinterest's use of his Works, he certainly did not manufacture his claim of copyright infringement in this litigation. Pinterest itself produced evidence ███████████████████████████████████ ███████████████████████████████████ It defies logic that these instances of infringement were all or even materially created by Mr. Davis or others working on his behalf in investigating his copyright claim against Pinterest. Pinterest also cannot deny that it used the entirety of Mr. Davis' Works, not an insubstantial or *de minimis* use. After all, Pinterest produced responsive documents using its own technology to identify exact matches or near duplicates of the Works on its website. Finally, it is clear from the record that Pinterest's DMCA takedown process does not address the infringing activity by Pinterest itself, so whether or not Mr. Davis availed himself of that limited process it is wholly irrelevant to any of Pinterest's affirmative defenses.

## **CONCLUSION**

For the reasons outlined above, the Court should grant Plaintiff's motion for partial summary judgment.

Respectfully submitted,

Dated: November 4, 2021

**REESE LLP**

*/s/ Sue J. Nam*
Sue J. Nam
Michael R. Reese
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Email: *snam@reesellp.com*
         *mreese@reesellp.com*

**REESE LLP**
George V. Granade
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Telephone: (310) 393-0070
Email: *ggranade@reesellp.com*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**REESE LLP**
Charles D. Moore (admitted *pro hac vice*)
100 South 5th Street, Suite 1900
Minneapolis, Minnesota 55402
Tel: (701) 390-7214
Email: *cmoore@reesellp.com*

**THE LAW OFFICE OF DAVID C. DEAL, P.L.C.**
David C. Deal (admitted *pro hac vice*)
P.O. Box 1042
Crozet, Virginia 22932
Telephone: (434) 233-2727
Email: *david@daviddeal.com*

*Counsel for Plaintiff Harold Davis*