United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

HAROLD DAVIS,

Plaintiff,

v.

PINTEREST, INC.,

Defendant.

Case No. 19-cv-07650-HSG

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 152, 160

Pending before the Court are cross-motions for summary judgment. Dkt. Nos. 152, 160. The Court held a hearing on the motions. For the reasons detailed below, the Court **GRANTS** Defendant's motion for summary judgment and **DENIES** Plaintiff's motion.

## I. BACKGROUND

### A. Factual Background[1]

Plaintiff Harold Davis is an artist and professional photographer. *See* Dkt. No. 160-2, Ex. 1 ("Davis Depo.") at 9:12–14; 66:15–24; *see also* Dkt. No. 153-1 at 10:11–16. Plaintiff contends that Defendant Pinterest, Inc. has infringed the copyrights of 51 of his works by copying and displaying the works on Pinterest's services. *See* Dkt. No. 56 ("SAC"), Ex. A; *see also* Dkt. No. 114-1 at 3 ("Plaintiff agreed to stipulate the 51 works identified in the SAC were the Works in Suit."). Pinterest operates an online platform—accessible through a mobile application and website—that allows users to upload images and videos to virtual "boards." *See* Dkt. No. 156 ("DeChant Decl.") at ¶¶ 2–3. To understand the alleged copyright infringement in this case, it is essential to understand how Pinterest operates. The Court therefore provides a brief overview.

[1] Except where otherwise noted, the relevant facts are undisputed.

United States District Court
Northern District of California

**i. Pinterest's Online Platform**

When a user uploads content to Pinterest, he is prompted to create a title and description for the image or video, and is asked to provide a "destination link" to a third-party website. *See id.* at ¶¶ 5–6. The content that a user uploads—including the title, description, and destination link—create a "visual bookmark" that Pinterest refers to as a "Pin." *See id.* at ¶ 7. Pinterest does not direct users to upload specific content. *See id.* at ¶¶ 2, 4. And because users upload the content, it is possible that a single image may be used by many different users to create distinct "Pins." *See id.* Pinterest acknowledges that it has billions of images on its site. *Id.* And given this volume, Pinterest does not manually review the content that users upload. *Id.*

The image that a user uploads is called the "original." Dkt. No. 160-3, Ex. 2 ("DeChant Depo.") at 29:2–4. Although Pinterest stores the originals on its servers, it does not display originals on its website or mobile application. *See id.* at 29:6–30:5, 46:16–47:13, 50:9–13. Rather, when a user uploads an image, Pinterest automatically creates copies of the original, which it calls "variants." *Id.* at 30:24–32:1, 47:14–16, 48:10–21. According to Pinterest, it does so primarily because the images that users upload are "usually not optimized for Pinterest." *See id.* at 82:11–25. Pinterest "want[s] images to load fast . . . so Pinners w[ill] have a delightful experience." *Id.* Pinterest therefore "generate[s] highly optimized images" of varying sizes for use on its services. *Id.*; *see also id.* at 73:4–20, 76:3–5 (noting variants are given different names internally based on their pixel width and/or height); DeChant Decl. at ¶¶ 8–10.

Pinterest offers different ways for users to access Pins on its website and mobile application. *See* DeChant Decl. at ¶¶ 12–18. When a user first logs into his Pinterest account, he will see his "personal home feed," or a grid-view of smaller-sized Pins. *See id.* at ¶ 13. If a user clicks on any of these Pins, he will be taken to another page that includes a larger view of the Pin, as well as the title, description, and destination link for that Pin. *See id.* at ¶ 12. Pinterest automatically generates a user's home feed with machine-learning algorithms based on multiple inputs, including Pins with which the user has interacted in the past; boards the user has created; searches the user has run; and the people, topics, and boards the user "follows" on the website or mobile application. *See id.* at ¶¶ 12–13. These algorithms influence both the content and layout

United States District Court
Northern District of California

of the feed. *See id.* According to Pinterest, users have some control over the content they see in their feed because they can remove specific Pins or edit their preferences for the content they will see. *Id.* at ¶ 13. Below is an example of this home feed:

*See* DeChant Decl., Ex. 1.

Pinterest also offers "related Pins feeds," which similarly use algorithms to predict what Pins will be most relevant to the user based on his past activity on the service. *See* DeChant Decl. at ¶¶ 14–15. These feeds are typically shown under the larger view of the Pin that a user has clicked on, as illustrated below. *See id.*

*Id.*, Ex. 2. Pinterest states that users are able to remove pins from these feeds, which refines the algorithms to further tailor the feeds to the user. *See id.* Pinterest also offers a search function, which allows users to search for content on its service. *See id.* at ¶ 16. Again, algorithms generate a feed with search results based on both the user's search query and his past activity on the service. *Id.* Pinterest states that users can likewise remove Pins from the search results, which helps the algorithms tailor future search results. *Id.*

**ii. Advertising**

Pinterest does not charge users for its services. *See id.* at ¶ 2. Rather, Pinterest generates revenue through third-party advertising across these various "feeds." *See id.* at ¶¶ 2, 17. An advertiser or business can create content, and then pay Pinterest to promote that content on the website and mobile application. *See* DeChant Depo. at 96:16–25; *see also* Dkt. No. 160-4, Ex. 3 ("Galgon Depo.") at 77:2–19. Advertisers may pay Pinterest per click or per view for these "promoted Pins." *See* Galgon Depo. at 45:22–48:2. As with "organic Pins" (*i.e.*, the content that users rather than advertisers upload), Pinterest creates variants and uses algorithms to determine which promoted Pins are displayed and how they are displayed to users in their feeds. *See id.* at 28:3–31:22, 59:8–60:16, 65:6–66:7, 66:25–67:23. In this way, Pinterest states that it tries to ensure that even promoted Pins are relevant to the user. *See, e.g.*, *id.* at 28:11–20. However, users

cannot opt out of seeing advertisements in their feeds. *See id.* at 45:6–12. These feeds, therefore, contain a combination of both organic Pins and promoted Pins.

Pinterest also sends notifications to its users by email, in the mobile application, and through push notifications. *See* DeChant Decl. at ¶ 18. According to Pinterest, these notifications alert users to content that Pinterest's algorithms have identified as being of possible interest to the user. *See id.* Pinterest also uses machine learning models to determine the frequency, content, and timing of notifications for users. *See* Dkt. No. 160-13, Ex. 12. Pinterest sends "billions of notifications . . . every week to users," and these notifications "drive a significant portion of monthly active users." *See* Dkt. No. 160-12, Ex. 11. Users, however, may turn off these notifications if they wish. *See* DeChant Decl. at ¶ 18. And these notifications do not contain advertisements. *See id.*

**iii. Allegations**

Plaintiff has clarified that in this case, he does not challenge users uploading his works or saving them to their boards. Dkt. No. 171 at 5, 14 ("[T]he images at issue in this case are not the Pins of Plaintiff's Works that users uploaded and displayed on their personal boards."); Dkt. No. 160 at 1 ("Mr. Davis has no quarrel with individual users of Pinterest (*i.e.*, 'Pinners'), who display Mr. Davis' Works on their Boards (*i.e.*, Pinterest's virtual bulletin boards) for personal purposes because they admire or are inspired by the Works."), at 21–22 (confirming Plaintiff does not contest "the uploading of content by Pinterest users to their boards, *i.e.*, Pins"). Rather, he challenges the public display of his works in proximity to or in the same feed as promoted Pins. Dkt. No. 171 at 5, 14; *see also* Dkt. No. 160 at 1, 26–27. For example, in the screenshot below, Plaintiff's work, "Kiss from a Rose," is displayed in the top left corner of this feed. Next to it is a promoted Pin for an art print called "White Tea Roses by Neicy Frey." Dkt. No. 160-11, Ex. 10.

United States District Court
Northern District of California

*Id.* This promoted Pin is labeled as "Promoted by Chairish." *Id.* Plaintiff contends that this constitutes "unauthorized commercial use" of his works. *See, e.g.*, Dkt. No. 160 at 1. Plaintiff also challenges the display and distribution of his works in emails and push notifications to users. *See* Dkt. No. 160 at 1.

As explained in more detail in Section III.A.i below, Plaintiff does not identify the exact number of times he contends Pinterest infringed his copyrights. *See* Dkt. No. 160 at 10. But he asserts that "it is reasonable to extrapolate the actual number of infringements by Pinterest during the three-year statute of limitations period to be in the hundreds of thousands, if not millions." *Id.* He notes, for example, that just one of his works, "Duet of Daffodils," appeared on Pinterest's website 4,676 times over the course of just two weeks. *See* Dkt. No. 160-1 ("Moore Decl.") at ¶¶ 21–22, 28.

**B. Procedural Background**

Plaintiff filed his initial complaint in November 2019, alleging both direct and contributory copyright infringement. *See* Dkt. No. 1. Defendant moved to dismiss Plaintiff's contributory infringement claim. *See* Dkt. No. 17. In response, Plaintiff filed the first amended complaint in March 2020. *See* FAC. Defendant again moved to dismiss the contributory infringement claim, and the Court granted the motion in July 2020. *See* Dkt. No. 39. In addition to amending Plaintiff's claim for contributory infringement, Plaintiff also sought to add a new claim to his complaint, a violation of the Digital Millennial Copyright Act (the "DMCA"), 17 U.S.C.

§ 1202(b), and to bring the action on behalf of a putative class. *See* Dkt. Nos. 41, 52. The Court denied the motion. *See* Dkt. No. 55. Plaintiff then filed his second amended complaint in November 2020. *See* SAC. Defendant again moved to dismiss the contributory infringement claim, Dkt. No. 62, and the Court granted the motion, Dkt. No. 75. Plaintiff's case, therefore, now consists of a single claim for direct copyright infringement. The parties have each moved for summary judgment. Dkt. Nos. 152, 160.

## II. LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.* The Court views the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008).

The moving party bears both the ultimate burden of persuasion and the initial burden of producing those portions of the pleadings, discovery, and affidavits that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will not bear the burden of proof on an issue at trial, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Where the moving party will bear the burden of proof on an issue at trial, it must also show that no reasonable trier of fact could not find in its favor. *Celotex Corp.*, 477 U.S. at 325. In either case, the movant "may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence."

*Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1105. "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Id.* at 1102–03.

"If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103. In doing so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. A nonmoving party must also "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). If a nonmoving party fails to produce evidence that supports its claim or defense, courts enter summary judgment in favor of the movant. *Celotex Corp.*, 477 U.S. at 323.

**III. DISCUSSION**

As noted above, Plaintiff contends that Pinterest has infringed the copyrights of 51 of his works by displaying these works in proximity to advertisements and by displaying and distributing them to users via notifications. *See* Dkt. No. 160 at 1, 26. In response, Pinterest (1) disputes the scope of the infringements at issue in this case; and (2) contends that it falls within the safe harbor under the DMCA. *See* Dkt. No. 174 at 15–19; *see also* Dkt. No. 152 at 10–27. Because the Court finds these issues dispositive, it addresses them first before turning to Plaintiff's motion.

**A. Discovery Disputes and Alleged Infringements**

Throughout the litigation, the parties have raised a large number of discovery disputes. *See, e.g.*, Dkt. Nos. 93, 98, 99, 103, 104, 115, 127, 131, 137. The parties' cross-motions for summary judgment suggest that they believe at least some of these discovery disputes have not been fully resolved. *See* Section III.A below. The parties agree that only the 51 works that Plaintiff identified in Exhibit A to the SAC are at issue in this case. However, the parties dispute what alleged *infringements* of these 51 works are at issue. *Compare* Dkt. No. 160 at 18–23, *with* Dkt. No. 174 at 4–7, 9–10. Pinterest argues that Plaintiff is trying to introduce new alleged infringements in his motion for summary judgment, well after the close of discovery. *See* Dkt. No. 174 at 4–7; *see also* Dkt. No. 176-1 at ¶¶ 10–246, & Ex. B (Plaintiff's summary of "instances

of infringement" from March 12, 2019, to November 11, 2020). Plaintiff, for his part, suggests that Pinterest engaged in delaying tactics, which prevented him from identifying the full scope of the alleged infringements earlier. *See* Dkt. No. 160 at 18–23.

**i. Identifying Alleged Infringements**

From the outset of this case, the parties have disputed whether and when Plaintiff should be required to identify all instances of alleged copyright infringement. *See* Dkt. No. 59. In their initial case management statement, Pinterest argued that requiring Plaintiff to identify the alleged infringements would allow it to investigate and take discovery as necessary. *Id.* at 2–3. Plaintiff, however, urged that he need only provide *examples* of the alleged infringement "because the instances of Defendant's infringement are numerous and on-going . . . ." *See id.* at 3. During the November 24, 2020 case management conference, the Court agreed with Pinterest that a deadline was necessary to ensure the efficient litigation of this case. The Court therefore directed the parties to meet and confer and submit a proposed case schedule incorporating such a deadline. The parties did so, *see* Dkt. No. 61, and on December 15, 2020, the Court largely adopted the parties' proposal in its scheduling order, Dkt. No. 63. The scheduling order set June 1, 2021, as the "[d]eadline for Plaintiff to serve final identification of alleged infringements at issue." *Id.* The scheduling order also set a July 2, 2021, discovery cut-off. *Id.* However, the order permitted *Pinterest* to "pursue discovery regarding the identified alleged infringements through September 3, 2021." *See id.*

The parties proceeded to engage in discovery. In December 2020, they exchanged interrogatories. Pinterest served Interrogatory No. 2:

> For each Work In Suit, identify the URL on Pinterest or other unique identifying information sufficient for Pinterest to locate each instance of alleged infringement.

*See* Dkt. No. 114-2, Ex. 2 at 3. As Judge Hixson and this Court later explained, Pinterest was asking Plaintiff about "his legal contentions: Identify each instance in which you claim we committed infringement." Dkt. No. 144 at 4 (quotations omitted). Plaintiff, in turn, served Interrogatory No. 6:

> Identify every instance in which Works have been Pinned, uploaded, downloaded, displayed or otherwise used on or through the Pinterest Platform. If you cannot identify every instance, explain why.

Dkt. No. 160-14, Ex. 13 at 15. Here, Plaintiff was asking Pinterest a factual question about the specific instances in which the 51 works appeared on Pinterest's platform.

As discussed in more detail below, Plaintiff asserts that Pinterest did not adequately respond to Interrogatory No. 6 until after the close of discovery. In any event, on June 1, 2021—the deadline for Plaintiff to identify the alleged infringements at issue in this case—Plaintiff produced a PDF of an Excel spreadsheet. *See* Dkt. No. 114 at 2. On June 4, Plaintiff's counsel emailed the Excel spreadsheet in native format. *See* Dkt. No. 153-22, Ex. V ("June 4 Spreadsheet"). This spreadsheet, however, only lists alleged infringements for 35 of the 51 works in suit. *Compare id.*, *with* SAC, Ex. A; *see also* Dkt. No. 153-26, Ex. Z (summary chart). Plaintiff also appears to concede that the June 4 Spreadsheet does not include any instances of infringement based on notifications that Pinterest sent to users, just instances of infringement based on Pinterest's various "feeds." *See* Dkt. No. 177 at 3–4 (describing evidence produced in August 2021, after the June 4 Spreadsheet, that shows instances in which notifications sent by Pinterest included links to Plaintiff's works); Dkt. No. 171 at 7–8, 13–14 (same).

Pinterest asked Plaintiff to confirm that the June 4 Spreadsheet constituted Plaintiff's final identification of the alleged infringements in this case, as required by the Court's scheduling order. *See* Dkt. No. 138-5., Ex. 4 at 1–2. Plaintiff did not address the spreadsheet directly. Rather, he responded that he "identified the federally registered images by artist and name," and "has explained in detail the nature of Pinterest's infringement and ha[s] provided *examples* of the infringement." *See* Dkt. No. 138-6, Ex. 5 (emphasis added). During subsequent communications, Plaintiff again stated that the June 4 Spreadsheet was merely "a sample of the URLs and Pin IDs" because "the same image may have hundreds or thousands of different URLs and Pin IDs." *See* Dkt. No. 114 at 3.

However, both Magistrate Judge Hixson and this Court rejected Plaintiff's argument that the June 4 Spreadsheet could contain just a sampling of the alleged infringements in this case. *See*

Dkt. Nos. 108, 144. As this Court explained:

> It is not Defendant's job to speculate about the nature and scope of Plaintiff's case. The Court understands Plaintiff's concern that the number of possible infringements may be vast, but as Judge Hixson aptly stated, "[i]t is up to [Plaintiff] to build his own case." *Id.* Plaintiff may not shift that obligation onto Defendant.
>
> . . .
>
> The June 4 Spreadsheet appears to be the only identification of the alleged infringements.

*See* Dkt. No. 144 at 7. The Court accordingly rejected Plaintiff's attempt to expand the scope of the alleged infringements beyond the June 4 Spreadsheet months after the deadline and close of discovery. *See id.* at 7–8. As the Court cautioned Plaintiff in October 2021, the only alleged instances of infringement still in this case are those identified in the June 4 Spreadsheet. *See* Dkt. No. 144.

Nevertheless, in his motion for summary judgment Plaintiff again suggests that the Court should permit him to add additional instances of alleged infringement that were not in the June 4 Spreadsheet. *See* Dkt. No. 160 at 18–23; *see also* Dkt. No. 176-1 at ¶¶ 10–246, & Ex. B. Plaintiff argues that these new infringements were only identifiable through discovery, and Pinterest engaged in "tactics of obfuscation and delay," which impeded his timely identification of these infringements. *See* Dkt. No. 171 at 12–13, 15.

Plaintiff points out that although he asked Pinterest to "[i]dentify every instance" in which the 51 works had appeared on Pinterest's platform, Dkt. No. 160-14, Ex. 13 at 15 (Interrogatory No. 6), and to produce related documents, Pinterest did not produce this information until Plaintiff filed a motion to compel. *See* Dkt. No. 160-15, Ex. 14 at 16–20. Judge Hixson eventually ordered Pinterest to conduct a reasonable search and produce documents within 30 days. *See* Dkt. No. 109 at 5. On August 19, 2021, in response to Judge Hixson's order, Pinterest finally identified documents that showed how often a duplicate or near-duplicate of the works in suit had appeared on a Pinterest feed and the date(s) of those activities. *See id.* at 19. However, Pinterest only produced searches from the week before Plaintiff filed the first amended complaint (March 4 to

March 10, 2020) and the week before Plaintiff filed the SAC (November 4 to November 10, 2020). *Id.* at 19. Plaintiff further notes that the documents that Pinterest produced on August 19, 2021, were not decipherable because they referenced a "pin_image_signature" rather than the name of the works in suit. *See* Dkt. No. 160 at 20. Pinterest did not produce documents to decode this "pin_image_signature" until September 10, 2021. *See* Moore Decl. at ¶¶ 17–30.

The Court understands that Plaintiff needed discovery from Pinterest before he could identify all the alleged infringements at issue in this case. Because notifications are sent directly to users, for example, Plaintiff could not run his own independent searches to find such instances of alleged infringement. Moreover, Plaintiff notes that after he filed the complaint in this case, Pinterest began disabling access to Pins of Plaintiff's 51 works across its platform. *See* Dkt. No. 160-8, Ex. 7 at 13:2–15:8, 31:217–32:18, 40:12–41:25, 63:17–64:25. Pinterest confirmed that someone could not search to find content that is no longer available on the platform. *See id.* at 40:12–41:5. And even the links in the June 4 Spreadsheet are no longer active. Even if Plaintiff had tried to compile this information for himself, therefore, he would have faced serious challenges.[2]

But Plaintiff's need for discovery to identify the instances of alleged infringement was neither surprising nor incurable. Plaintiff could have moved to compel production of these documents. Still, Plaintiff fails to explain why he did not do so earlier, or request more time to provide the final identification of the alleged infringements. Instead, he waited until July 9, 2021—more than a month after the deadline—to move to compel. *See* Dkt. No. 98. As Judge Hixson noted in response: "Yikes." *See* Dkt. No. 109 at 1. Judge Hixson further recognized that:

> The timing and content of this motion to compel are problematic. The Court will rule on the issues presented to the extent that Davis's briefing enables it to do so. But a motion to compel filed on the last

[2] Plaintiff attempts to characterize Pinterest's actions as "spoliation." *See* Dkt. No. 160 at 20. But Plaintiff has not proffered concrete evidence that Pinterest failed to preserve relevant evidence. Although users and third parties may not have had access to Plaintiff's works on the platform any longer, there is no evidence in the record that Pinterest did not preserve sufficient information about the alleged instances of infringement. Moreover, if, as Plaintiff argues, Pinterest's display of these works constitutes infringement, it defies logic to argue that Pinterest is somehow powerless to stop any purported future infringement while the case proceeds.

> possible day that argues solely in the negative that certain objections lack merit may not result in much effective relief.

*See id.* Plaintiff attempts to blame Pinterest for the timing of his discovery of these new infringements, but *Plaintiff* chose to wait so long to obtain the information he needed for his case. Plaintiff was on notice of his June 1, 2021, deadline in December 2020, when the Court entered the scheduling order. *See* Dkt. No. 63. Plaintiff offers no explanation why, with six months' notice, he could not move to compel (if required) and meet this deadline.

**ii. Precluding Untimely Alleged Infringements**

In a final attempt to expand the alleged infringements in this case, Plaintiff also suggests that the Court lacks authority to preclude this evidence. *See* Dkt. No. 176 at 4–5; *see also* Dkt. No. 171 at 23–28. Plaintiff argues that the Court is improperly imposing sanctions against him for his discovery failures. *See* Dkt. No. 176 at 4 (citing Civil L.R. 7-8); *see also* Dkt. No. 171 at 27. He states that to impose such sanctions, Pinterest had to "file a separate motion to exclude the evidence as a sanction," which it did not do. *See* Dkt. No. 176 at 4. Plaintiff further argues that there is no evidence that he acted in bad faith. *Id.*

Plaintiff relies on *R & R Sails, Inc. v. Ins. Co. of Pennsylvania*, 673 F.3d 1240, 1247 (9th Cir. 2012). In *R & R Sails*, the district court found that the plaintiff had violated its disclosure requirements under Federal Rule of Civil Procedure 26(a) and 26(e), by failing to provide defendant with copies of invoices to support its request for attorneys' fees. *Id.* at 1245–46. The district court excluded the invoices under Rule 37(c)(1). Under Rule 37:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1). The Ninth Circuit explained that the district court did not abuse its discretion in finding that the plaintiff had indeed failed to meet its obligations under Rule 26(a)(1) and Rule 26(e)(1). *See id.* 1246. Nevertheless, the Court noted that excluding the invoices effectively "amounted to dismissal of a claim," because the invoices were the sole evidence the

United States District Court
Northern District of California

plaintiff intended to use to support its claim for attorneys' fees and punitive damages. *See id.* at 1243, 1247. The Ninth Circuit held that the district court was therefore "required to consider whether the claimed noncompliance involved willfulness, fault, or bad faith" and whether "lesser sanctions" were available. *See id.* at 1247. Because there was no evidence that the district court had conducted this inquiry, the Ninth Circuit remanded the case for further proceedings. *See id.* at 1247–48.

In contrast, precluding Plaintiff from introducing instances of alleged infringement that he did not identify in the June 4 Spreadsheet does not amount to the dismissal of a cause of action. Plaintiff's claim for direct copyright infringement remains, even without the introduction of new instances of infringement. The Court, therefore, need only consider whether Plaintiff's failure to timely disclose these new infringements is substantially justified or is harmless. *See* Fed. R. Civ. P. 37(c)(1); *see also Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (noting nondisclosure is harmless if it does not prejudice the other party). To determine whether the untimely disclosure was substantially justified or harmless, a court may consider: "(1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure that prejudice; (3) the likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence." *Lanard Toys, Ltd. v. Novelty, Inc.*, 375 Fed. App'x 705, 713 (9th Cir. 2010) (citing *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003)).[3]

Plaintiff's repeated attempts to sidestep the Court's deadlines suggest that he may have believed he would not be—or should not be—held to the June 1 deadline. But he ignored this deadline at his own hazard. As noted above, the delay is not substantially justified. Plaintiff had ample time to obtain the discovery he required. Nor is the delay harmless. Plaintiff did not raise these new instances of infringement until approximately four months after the close of discovery and after briefing on dispositive motions had begun. After the motions for summary judgment were argued, the Court vacated the trial date given the nature of the issues raised in the motions.

[3] As an unpublished Ninth Circuit decision, *Lanard Toys* is not precedent, but may be considered for its persuasive value. *See* Fed. R. App. P. 32.1; CTA9 Rule 36-3.

However, at the time the motions were filed, trial was fast approaching and it would have been infeasible to reopen discovery.  Plaintiff therefore left Pinterest with no ability to effectively address these new instances of infringement.  Plaintiff also seeks to introduce significantly more instances of infringement than he initially identified, which would markedly expand the scope of this case.  Plaintiff's argument, if accepted, would render discovery deadlines meaningless.  The Court finds that Plaintiff's failure to timely disclose these new alleged infringements is thus inherently prejudicial.  *See Yeti*, 259 F.3d at 1107 (finding prejudice where plaintiffs received an expert report one month prior to trial and would need to depose the expert and prepare to question him at trial).

Plaintiff cannot radically expand the scope of this case at the eleventh hour.  The June 4 Spreadsheet was—and remains—the final identification of alleged instances of infringement in this case.  Plaintiff therefore only timely identified instances of alleged infringement for 35 of the 51 works.  And these alleged infringements only occurred in the feeds on Pinterest's platform Thus, as relevant for the Court's remaining analysis, instances of alleged infringement from Pinterest's notifications are not at issue in this case.

Even if the Court were to consider the notifications sent to Pinterest users, however, it is not clear how they infringe Plaintiff's copyrights.  The notifications do not appear to contain copies of Plaintiff's works.  Rather, they contain *hyperlinks* to images on Pinterest's website and mobile application.  *See, e.g.*, Dkt. No. 153-25, Ex. Y at 4 ("[T]he notifications merely contain links to images that are hosted on a remote server on the Internet."); Dkt. No. 178-2, Ex. 1 at 42:3–43:24.  Courts have held that "hyperlinking alone does not constitute copyright infringement, since it does not involve any actual copying."  *See eAdGear, Inc. v. Liu*, No. CV-11-05398 JCS, 2012 WL 2367805, at *12 (N.D. Cal. June 21, 2012), *report and recommendation adopted*, No. C-11-05398 RMW JCS, 2012 WL 4005454 (N.D. Cal. Sept. 11, 2012) (collecting cases).

Plaintiff appears to acknowledge that the notifications only contain hyperlinks.  *See, e.g.*, Dkt. No. 152 at 8–9 ("Notifications [] link to pages on Pinterest's own website.").  He argues, however, that this "is an irrelevant fact" because "[a]ny hyperlinks in notifications merely link back to pages on Pinterest's own website and its own Variants . . . ."  *See* Dkt. No. 178 at 5, & n.1.

Plaintiff's contention that these notifications infringe his copyrights therefore collapses into his argument that Pinterest infringes his copyrights by displaying images on the Pinterest website and mobile application. The Court addresses Pinterest's website and mobile application in the context of the DMCA's safe harbor below.

**B. Safe Harbor**

Turning to the merits, Defendant invokes the protection of the DMCA's safe harbor under 17 U.S.C. § 512(c). *See* Dkt. No. 152 at 10–27; Dkt. No. 174 at 15–20. In enacting the DMCA, "Congress recognized that [i]n the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability." *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (citing S.Rep. No. 105–190, at 8 (1998)). The DMCA therefore strikes a balance between the interests of "copyright holders in benefitting from their labor; . . . entrepreneurs in having the latitude to invent new technologies without fear of being held liable if their innovations are used by others in unintended infringing ways; and those of the public in having access [to] both . . . ." *See Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1037 (9th Cir. 2013). "The DMCA balances these interests by requiring service providers to take down infringing materials when copyright holders notify them of the infringement and by limiting service providers' liability for unintentional infringement through several safe harbors." *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1051–52 (9th Cir. 2017).

Section 512(c) in particular limits service providers' liability for "infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(c). To qualify for protection under this provision, a service provider must not have knowledge of the infringements, and, as relevant to this case, must not:

> receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity . . . .

*Id.* at § 512(c)(1)(B). Therefore, for a service provider to lose safe harbor protection under

§ 512(c), the plaintiff must show both that the service provider had the right and ability to control the alleged infringements and that it received a financial benefit directly attributable to those specific alleged infringements. *See Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 612 (9th Cir. 2018).

Here, Plaintiff does not appear to dispute that Pinterest is a service provider for purposes of § 512(c). *See, e.g.*, Dkt. No. 171 at 2–13. Instead, he argues that Pinterest does not qualify under the safe harbor because (1) Pinterest's infringing activity is not "by reason of . . . storage at the direction of a user"; (2) Pinterest has "the right and ability to control" the infringing activity; and (3) Pinterest receives "a financial benefit directly attributable to the infringing activity." *See, e.g.*, Dkt. No. 171 at 2–13; Dkt. No. 176 at 10–12. Plaintiff's arguments all turn on the scope of the alleged "infringing activity" in this case.

**i. Infringing Activity**

Plaintiff narrowly defines the claimed infringing activity at issue. Notably, Plaintiff does *not* challenge:

- Users uploading his works to Pinterest, *see* Dkt. No. 160 at 1, 21–22; Dkt. No. 171 at 1, 5, 14;
- Pinterest creating variants of these uploaded works in standard display formats so that they are more compatible with the platform, *see* Dkt. No. 171 at 2; Dkt. No. 176 at 10;
- Users pinning his works to their boards, *see* Dkt. No. 160 at 1; Dkt. No. 171 at 1;
- Pinterest using machine learning algorithms "to enable users to locate and gain access" to his works, *see* Dkt. No. 171 at 2; Dkt. No. 174 at 1, 3–4; or
- Pinterest using these algorithms to suggest "related content" that was uploaded by users, including his works, *see* Dkt. No. 171 at 2.

Instead, Plaintiff challenges only Pinterest's creation of variants and use of algorithms to "select and display Plaintiff's Works in the context of advertisement." *See* Dkt. No. 171 at 1, 3–4. Plaintiff suggests that Pinterest creates variants of his works—and all uploaded content—for both

non-infringing and infringing purposes. *See* Dkt. No. 160 at 4–6. Plaintiff argues that part of the reason Pinterest creates variants is "to track user interaction" and to "target advertisements to users." *See id.* at 6, 10, 12. Plaintiff asserts that to do so Pinterest "embeds" information onto variants "so its automated machine learning ("AutoML") can use that information to effectively display advertisement" in the same feed as organic pins. *See id.* at 3–5, 14; *see also* Dkt. No. 160 at 30–31. Plaintiff thus narrows the purportedly "infringing activity" in this case to the creation of variants, the "embedding" of these variants with data for Pinterest's advertising algorithms, and the display of these variants in proximity to advertisements on the platform.[4] *See* Dkt. No. 171 at 5–6, 10, 12, 14. In other words, under Plaintiff's theory, Pinterest does not infringe Plaintiff's copyrights when it creates a variant and uses algorithms to help users locate that variant. However, Pinterest *does* infringe when it creates the same variant and uses algorithms to display advertising in proximity to that variant.

**a. Embeddings**

Plaintiff's theory that the creation of variants is infringing activity is not supported by the record. According to Plaintiff, Pinterest "embeds" data or information within the variants so the AutoML algorithms can effectively display advertising in their proximity. *See* Dkt. No. 171 at 3–5, 14; *see also* Dkt. No. 160 at 30–31. Plaintiff emphasizes that this "embedded data" is "of Pinterest's own choosing," and facilitates Pinterest's own financial objectives rather than user access. *See* Dkt. No. 171 at 4 (emphasis omitted); *see also* Dkt. No. 176 at 8 (arguing that Pinterest uses variants to track users and "generate advertisement revenue"). Despite these assertions, Plaintiff has not pointed to any evidence in the record that Pinterest actually embeds information within variants for use with its advertising algorithms. To support his argument, Plaintiff appears to mischaracterize excerpts from Pinterest's deposition testimony and internal documents.

Plaintiff first points to Mr. DeChant's deposition testimony. *See* Dkt. No. 171 at 3–5; *see also* Dkt. No. 176 at 7–10. When asked what images Pinterest displays on its platform, Mr.

[4] As explained in Section III.A above, instances of alleged infringement due to notifications that Pinterest sent to its users are not at issue in this case.

United States District Court
Northern District of California

DeChant explained that Pinterest "encode[s] them in-house" from the images that users upload. *See* DeChant Depo. at 30:24–32:1, 34:6–10, 87:1–5. Mr. DeChant further explained that for variants created after approximately 2021, Pinterest ensures that they maintain preexisting metadata regarding copyright management information from the originals. *Id.* at 34:6–35:17, 42:1–44:5, 48:1–9. Plaintiff urges that Pinterest therefore had exclusive control over what was and was not "embedded" within these variants *See* Dkt. No. 176 at 9–10. Plaintiff also cites the deposition of Ryan Galgon, the "Head of Ads Quality Product" at Pinterest, who explained that Pinterest relies on "signals from the user" to create the Pinterest feeds, but that users do not control the order in which Pins appear on their feeds. *See* Galgon Depo. at 55:22–57:8, 59:8–62:25.

Plaintiff also relies on a Pinterest blog post which discusses the company's AutoML algorithms and "embeddings" in the context of advertisements. *See* Dkt. No. 171 at 3–5; *see also* Dkt. No. 160-9, Ex. 8 (blog post). The post explains that Pinterest aims to predict users' engagement with advertisements, including "how likely a user is to save or hide an ad." *See id.* at 1. The post then describes the various technologies that Pinterest uses. *See id.* at 1–11. Plaintiff cites a single sentence from this document discussing Pinterest's AutoML technology:

> AutoML features a simple descriptive template to fuse varieties of pre-implemented feature transforms such that the deep neural networks are able to learn from raw signals.

*Id.* at 1. From this sentence, Plaintiff suggests that Pinterest "embeds" information or software within variants to target advertising to users. *See* Dkt. No. 171 at 4. But the document does not describe any such process. Rather, the post explains that AutoML reads "raw signals" and "raw features" to learn about user engagement and user satisfaction. *See* Dkt. No. 160-9, Ex. 8. Mr. Galgon explained that raw signals may include data from the "raw image." *See* Galgon Depo. at 52:14–24, 55:2–57:8. As an example, he explained that the title of a Pin may be considered a "raw signal." AutoML's model could then "transform" this signal into the number of words in the title. *See* 56:12–22. But the user, not Pinterest, supplies the title of a Pin. And nothing in the blog post or Mr. Galgon's testimony suggests that AutoML embeds data from its models *onto* the Pin.

United States District Court
Northern District of California

To the contrary, Mr. Galgon testified that "[v]isual embeddings . . . are generated internally at Pinterest *for* pins." *Id.* at 66:4–7, 67:14–23. They "*come off* or are *derived from* the image in a pin and in images composed of many pixels." *See id.* at 73:24–74:5 (emphasis added).

There is simply no evidence in the record that Pinterest embeds anything within Pins generally, or Plaintiff's works specifically, to create or obtain signals for its advertising algorithms. Plaintiff's conclusory assertions to the contrary are simply not enough to raise a material dispute of fact on this issue. The uncontroverted evidence in the record indicates that the "embeddings" discussed in the blog post and in employees' testimony "are not pieces of data that are added to any image file on the service." *See* Dkt. No. 174-14 at ¶ 4. "Embeddings" is simply a term of art in machine learning that refers to "cues (both visual and textual) that machine-learning algorithms glean from Pins, including from the image itself and the user-supplied title and description." *See id.* Mr. DeChant explained, for example, that for Pinterest's models to determine that a Pin is a flower, it may "look at the description" and "look at the title" of a Pin. *See* Dkt. No. 174-12, Ex. 11 at 60:3–61:9. These models may be based on, but are not embedded within, the Pins themselves.

**b. Algorithms**

The allegedly infringing activity at issue in this case is therefore limited to Pinterest's use of algorithms to "select and display Plaintiff's Works in the context of advertisement." *See* Dkt. No. 171 at 1, 3–4. As discussed in more detail below, Plaintiff offers no case law to support his theory that the use of computer algorithms to analyze user engagement and to tailor advertising prevents the application of the § 512(c) safe harbor.

The Court also has concerns that Plaintiff is attempting an end-run around the DMCA by asserting that he does not have a problem with users uploading his works to Pinterest in the first instance. The DMCA does not permit copyright holders to dictate the manner in which service providers run their platforms. Instead, "Section 512(c) codifies a detailed notice and takedown procedure by which copyright holders inform service providers of infringing material accessible through their sites, and service providers then 'disable access to' such materials." *UMG*, 718 F.3d at 1018 (citing 17 U.S.C. § 512(c)(1)(A)(iii), (c)(1)(C), & (c)(3)(A)(iii)). Plaintiff takes issue with

Pinterest's DMCA takedown procedure because "there was no avenue . . . for Mr. Davis to object to Pinterest's commercial use of his Works but not request that the underlying Pin be taken down." *See* Dkt. No. 160 at 12. In other words, rather than notify Pinterest of alleged copyright infringement on its platform so Pinterest can remove it, Plaintiff wants Pinterest to continue to display his images on its website and mobile application, but he does not want Pinterest to profit in any way from doing so.

Plaintiff also emphasizes the burden that identifying instances of infringement places on him. *See, e.g.*, *id.* at 16–18. The Court understands Plaintiff's concerns that sending individual forms for each instance of infringement may seem impracticable given the scope of his work and its numerous appearances on Pinterest. *See* Dkt. No. 160 at 15–16. When asked to estimate how long it would have taken for him to provide Pinterest electronic copies of his images to remove them from its services, Plaintiff said it would take "[t]wo years full-time, five years full-time, I really don't know," and would involve "[l]ots and lots and lots of uncompensated time." *See* Davis Tr. at 264:16–265:22. But Congress, not this Court, decided as a policy matter who should bear the burden of identifying infringement in the first instance.

**ii. By Reason of the Storage at the Direction of the User**

In any event, the Court finds that the DMCA safe harbor applies to the facts of this case. First, as noted above, § 512(c)'s safe harbor applies to any claim of copyright infringement that arises "by reason of the storage at the direction of a user of material that resides on" the service provider's system. 17 U.S.C. § 512(c)(1). In *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, the Ninth Circuit took a pragmatic and broad view of what this language means, explaining that it is "clearly meant to cover more than mere electronic storage lockers." 718 F.3d at 1016 (citing 17 U.S.C. § 512(c)(1)(A)). The Court pointed out that users upload and companies store materials "in order to make those materials accessible to other Internet users." *Id.* at 1018 (emphasis omitted). In short, "[t]he reason one has a website is so that others may view it." *Id.*; *accord Motherless*, 885 F.3d at 606 ("'[S]torage at the direction of a user' affords safe harbor protection to sites where users can look at other users' uploads"). Parties thus may enhance users' accessibility to uploaded content without losing protection under § 512(c). *See UMG*, 718 F.3d at

1018 (finding that § 512(c) "encompasses [] access-facilitating processes that automatically occur . . . .").

*UMG* is illustrative.  There, the defendant Veoh operated a publicly accessible website that allowed users to upload and share videos with other users.  *See id.* at 1011.  The plaintiff filed suit against Veoh for copyright infringement, arguing that Veoh users had been downloading and sharing videos containing music for which UMG owned the copyright.  *See id.* at 1011, 1013.  When a user uploaded a video, Veoh's software would automatically break the file into smaller pieces and convert the video file to Flash 7 format.  *See id.* at 1012.  According to Veoh, they did this because "the vast majority of internet users have software that can play videos in this format." *Id.* (quotations omitted).  Veoh also extracted metadata from the videos "to help others locate the video for viewing."  *See id.*  On appeal, UMG argued that these automatic processes went beyond mere "storage," and were not done "at the direction of the user."  *See id.* at 1015–16.  The Ninth Circuit rejected these arguments.  *Id.* at 1016–20.  The Court noted that "one is unlikely to infringe a copyright by merely storing material that no one could access."  *Id.* at 1019.  Thus, § 512(c) anticipates that to ensure access to user-uploaded content, service providers must "make, transmit and download multiple copies of users' stored materials."  *Id.* at 1018.  The Court thus concluded that "there is no limitation on the service provider's ability to modify user-submitted material to facilitate storage and access, as Veoh's automatic processes do."  *See id.* at 1019–20.

Plaintiff appears to concede that Pinterest engages in at least some automated processes to facilitate users' access to content on Pinterest's platform.  *See* Dkt. No. 171 at 2–3 (noting that providing user-uploaded content efficiently is "one aspect of Pinterest's creation of [v]ariants"). As Nicholas DeChant, a Senior Software Engineer at Pinterest, explained, Pinterest creates variants of different sizes from the content that users upload to enhance the user experience.  *See* DeChant Depo. at 73:4–20, 76:3–5, 82:11–25.  The images that users upload are "usually not optimized for Pinterest," but Pinterest's variants allow images to load faster.  *See id.  See id.* at 82:11–25; *see also* DeChant Decl. at ¶¶ 8–10.  Pinterest's creation of variants for these user-accessibility purposes is precisely the kind of process that courts have found to occur "by reason of the storage and at the direction of the user."

United States District Court
Northern District of California

To the extent that Plaintiff suggests tracking user activity through algorithms or displaying advertising on the platform is somehow copyright infringement, he offers no support for this novel theory.[5] *See, e.g.*, Dkt. No. 176 at 7 ("The undisputed evidence is that the users never asked to be tracked using the Variants that Pinterest created from Plaintiff's Works . . . ."). Copyright infringement requires Plaintiff to establish that Pinterest "violate[d] at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1159 (9th Cir. 2007). Neither tracking users' activity nor displaying advertising near Plaintiff's works violates Plaintiff's exclusive rights. But even if this did constitute infringing activity, such conduct would still fall within § 512(c)'s protection.

*Viacom International, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012), offers a useful analogy. There, the Second Circuit considered whether YouTube was protected by the DMCA's safe harbor provision. YouTube allowed users to upload and view video clips for free. *See id.* at 28–29. When a user uploaded content, YouTube's automatic software functions would make copies of the video in its original format and in Flash format to ensure the video was accessible by other users. *Id.* YouTube also used computer algorithms to analyze the video a user selected in order to identify other related videos. *Id.* at 28. This "related videos" function would then display links to and "thumbnails" of these other videos. *Id.* In upholding the district court's grant of summary judgment, the Second Circuit rejected the plaintiffs' argument that this related videos function constituted "promotion" rather than "access" to stored content. *Id.* at 39–40. The court explained that the algorithms were fully automated, and ultimately "serve[d] to help YouTube users locate and gain access to material stored at the direction of other users." *Id.* at 40.

So too here. The evidence shows that Pinterest uses algorithms based on user preferences to identify and display Pins in users' feeds. As in *Viacom*, this helps facilitate users' access to Pins. Moreover, even if using algorithms to promote advertising could somehow be problematic, the evidence in this case indicates that the algorithms used to identify and display organic Pins are separate from the algorithms used to identify and display promoted Pins in a user's feed. *See* Dkt.

[5] The Court addresses the separate question of whether Pinterest receives "a financial benefit directly attributable to the infringing activity" in Section III.B.iv.

No. 157 ("Galgon Decl.") at ¶ 9 ("The process through which advertisements appear in feeds is independent from the process through which non-advertising content appears in them."); DeChant Decl. at ¶ 17 (same).  The algorithms that select whether and how to display *Plaintiff's works* in Pinterest's feeds are thus still promoting user access to user-uploaded content.

During the hearing on the cross-motions for summary judgment, Plaintiff identified *BWP Media USA Inc. v. Polyvore, Inc.*, 922 F.3d 42 (2d Cir. 2019) (per curiam), as his best case in support of the idea that Pinterest's infringing conduct was not "by reason of the storage at the direction of a user of material that resides on" the service provider's system.  *See* Dkt. No. 184 ("MSJ Tr.") at 9:5–10:3.  The Court finds this case inapposite.

In *Polyvore*, the Second Circuit briefly considered a challenge to a website that "allowed users to create and share digital photo collages devoted to fashion, art, and design."  *See id.* at 44 (Walker, J., concurrence).  The website provided a tool for users to "clip" images from other websites and collect them on Polyvore's platform.  *Id.* at 44–45.  From these clipped images, Polyvore created a vast database of searchable images on its site.  *See id.* at 45.  The district court did not address the applicability of § 512(c).  Rather, it found that the plaintiff had not provided sufficient evidence that Polyvore had acted volitionally, as required to establish direct infringement, and granted summary judgment in favor of Polyvore.  *See id.* at 46–48.

On appeal, the Second Circuit succinctly found in a per curiam opinion that the district court had erred in granting summary judgment as to direct infringement because "there is a dispute of material fact regarding whether Polyvore created multiple copies of [the plaintiff's] photos that were not requested by Polyvore users."  *Id.* at 44.  In concurrence, Judge Walker noted that he could not determine from the record whether the safe harbor applied because the defendant had not provided evidence about why additional copies of the uploaded images were made.  *See id.* at 54–55, 57–59.  Judge Walker cited the Second Circuit's opinion in *Viacom*, and said he would remand the case for the district court to apply its reasoning after further factfinding.  *Id.* at 59.  The opinion in *Polyvore*, however, does not provide concrete guidance for the application of *Viacom* or the safe harbor.

Ultimately, Plaintiff appears to dislike that Pinterest obtains revenue from advertisements

on its platform, on which Plaintiff's artwork also appears. However, courts have not withheld safe harbor protection simply because service providers advertise on their platforms alongside user-uploaded content. In *UMG*, the Ninth Circuit noted that "Veoh generates revenue from advertising displayed along with the videos" on its platform. *See* 718 F.3d at 1011. In *Motherless*, the Ninth Circuit considered whether safe harbor protection should extend to a pornography website. *See* 855 F.3d at 600–01, 606. Users could upload images and videos, and the plaintiff alleged that the website contained clips of its copyrighted movies. *See id.* at 602–03. In determining whether materials on the site were there "by reason of the storage and at the direction of a user," the Ninth Circuit focused on the fact that users—and not the plaintiff—actually uploaded the pictures and videos. *See id.* at 604–08. The fact that the website had an incentive program, in which users received credits for the most popular material on the site, did not change the analysis. *See id.*; *see also id.* at 613. Ultimately, the court reasoned that the images and videos were "up on the site[] because the users put them there." *See id.* at 606. As in *UMG*, the court noted that 85% of the website's revenue came from advertisements, and that "more views would lead to more advertising revenue." *See id.* at 600-01, 613. But the Ninth Circuit still held that its activities were protected by § 512(c). *See id.* at 604–20.

As in *UMG* and *Motherless*, Plaintiff's works appear on Pinterest because users upload them. And Pinterest creates optimized copies and uses algorithms to enhance users' access to these images. There thus is no triable issue of fact as to whether Plaintiff's claim for copyright infringement arises "by reason of the storage at the direction of a user of material that resides on" the service provider's system. 17 U.S.C. § 512(c)(1).

**iii. Right and Ability to Control the Infringing Activity**

The record here also reflects no triable issue of fact as to whether Pinterest had the "right and ability to control" the infringing activity. Section 512(c) is unavailable to a service provider where "the service provider has the right and ability to control [infringing] activity." 17 U.S.C. § 512(c)(1)(B). The Ninth Circuit has explained that the right and ability to control the infringing activity means "something more than merely having the general ability to locate infringing material and terminate users' access." *See Fung*, 710 F.3d at 1045 (quotation omitted). Rather,

"the service provider must [also] exert[] substantial influence on the activities of users." *See id.* (quotation omitted). In *UMG*, the Court explained that the right and ability to control could also include "purposeful conduct" that intentionally induces infringing activity by users. 718 F.3d at 1030; *accord Motherless*, 885 F.3d at 613 (affirming grant of summary judgment to service provider where "uploaders, not [defendant], controlled what was uploaded" and "there was nothing in the uploaded video clips to identify their infringing nature").

In *Fung*, the Ninth Circuit held that there was "overwhelming evidence" that the plaintiff had "engaged in culpable, inducing activity," and therefore did not qualify for the § 512(c) safe harbor. 710 F.3d at 1046. The plaintiff operated peer-to-peer filing sharing websites that collected and indexed torrent files. *See id.* at 1027–29. These sites both solicited torrent files from users and collected torrent files from *other* torrent sites. *See id.* The Ninth Circuit held that the plaintiff was ineligible for protection under § 512(c) because:

> Fung organized torrent files on his sites using a program that matches file names and content with specific search terms describing material likely to be infringing, such as "screener" or "PPV." And when users could not find certain material likely to be infringing on his sites, Fung personally assisted them in locating the files. Fung also personally removed "fake[], infected, or otherwise bad or abusive torrents" in order to "protect[] the integrity of [his websites'] search index[es]."

*Id.* at 1046 (alterations in original).

These cases focus on the control that defendants have over users' infringing activity. *Accord Motherless*, 885 F.3d at 613 ("Nothing in the record suggests that Motherless told its users what to upload. . . . [T]he uploaders, not Motherless, controlled what was uploaded."). There is no evidence in the record that Pinterest exercises this kind of control. Users upload content, and Pinterest does not direct them to upload any specific content. *See, e.g.*, DeChant Decl. at ¶¶ 2, 4.

Plaintiff emphasizes that "Pinterest has sole control over how it displayed [Plaintiffs' works] among paid advertisement in search results, the 'home feed,' and 'related Pins' feeds, and users cannot opt out of these feeds." *See* Dkt. No. 176 at 11. But again, he does not explain how the use of algorithms or the existence of advertisement on the platform constitutes infringing

activity. Nor does he explain how Pinterest's control over its algorithms or the advertising on its platform constitutes the kind of control that is necessary to lose safe harbor protection under § 512(c). The Court finds this conduct indistinguishable from that of YouTube in *Viacom*, and thus concludes that Pinterest meets the second requirement for the safe harbor.

**iv. Financial Benefit from the Infringing Activity**

Lastly, to show the required financial benefit, Plaintiff must show that the service provider earned revenue "distinctly attributable to the infringing material at issue." *Motherless*, 885 F.3d at 613.

As an initial matter, Plaintiff has not identified evidence that Pinterest received any financial benefit from an advertisement that appeared in proximity to one of the specific alleged infringements in this case. During the hearing on these motions, Plaintiff's counsel explained that they attempted to obtain financial information from Pinterest through discovery, but were ultimately unsuccessful. *See* MSJ Tr. at 15:14–16:15. Plaintiff's counsel therefore acknowledged that they did not have evidence linking a specific work with any amount of money that Pinterest earned through advertising. Rather, Plaintiff's argument is that Pinterest's business model relies on advertising displayed next to organic Pins. *See id.* As counsel urged, "the entirety of Pinterest's website is to sell advertisement space." *See id.* at 15:23–24.

Plaintiff's evidence regarding Pinterest's overall business model, however, does not establish that Pinterest obtained a financial benefit distinctly attributable to the infringement alleged here. The advertisements may be shown in proximity to Plaintiff's works, but as already explained, the algorithms that Pinterest uses for its advertisements are not associated with those works. *See, e.g.,* Galgon Decl. at ¶ 9. Pinterest uses distinct algorithms to determine the layout of organic Pins and promoted Pins in the same feed. *See* DeChant Decl. ¶ 17; *see also* DeChant Depo. at 100:14–101:5. Therefore, despite Plaintiff's suggestion, neither advertisers nor Pinterest can target advertisements to appear near any specific organic Pin. *See* Galgon Decl. ¶ 6. Pinterest's advertisements are instead tailored to the Pinterest *user*. *See id.* An advertiser, for example, may choose to target Pinterest users of a certain demographic, age, or gender. The Court need not opine on the desirability as a policy matter of advertisers gaining such detailed insight

into users' behavior and history. It is enough for purposes of this opinion that such targeting does not generate revenue "directly attributable" to Plaintiff's works.

At bottom, Plaintiff's theory appears to be that by displaying his works at all, Pinterest is able to drive traffic to Pinterest's website, where it derives revenue from separate advertising. The Ninth Circuit has explicitly held that this is not sufficient. In the context of the pornography website in *Motherless*, the Court acknowledged that "[o]f course, the more pornography Motherless had, the more users it would attract, and more views would lead to more advertising revenue." *See Motherless*, 885 F.3d at 613. But "[t]he words 'the' and 'directly' in the statute . . . must mean that some revenue has to be distinctly attributable to the infringing material at issue." *Id.* The Ninth Circuit thus concluded that the service provider could not lose its safe harbor protection absent "evidence that Motherless made [] money directly from the [clips of the plaintiff's movies]." *Id.* The same principle controls here.

* * *

The Court finds that there are no disputes as to any material facts relating to the DMCA safe harbor. The DMCA safe harbor applies in this case and bars Plaintiff's direct infringement claim. The Court therefore need not address whether Plaintiff has met his burden of establishing direct copyright infringement.

## IV. CONCLUSION

Accordingly, the Court **GRANTS** Pinterest's motion for summary judgment and **DENIES** Plaintiff's motion. The Clerk is directed to enter judgment in favor of Defendant and to close the case. Dkt. Nos. 185, 186, 187, 188, 189 are **TERMINATED** as moot.

**IT IS SO ORDERED.**

Dated: 5/3/2022

HAYWOOD S. GILLIAM, JR.
United States District Judge